## STONE *v*. MISSISSIPPI.

1. In 1867, the legislature of Mississippi granted a charter to a lottery company for twenty-five years in consideration of a stipulated sum in cash, an annual payment of a further sum, and a percentage of receipts from the sale of tickets. A provision of the Constitution adopted in 1868 declares that "the legislature shall never authorize any lottery, nor shall the sale of lottery-tickets be allowed, nor shall any lottery heretofore authorized be permitted to be drawn, or tickets therein to be sold." *Held*, 1. That this provision is not in conflict with sect. 10, art. 1, of the Constitution of the United States, which prohibits a State from "passing a law impairing the obligation of contracts." 2. That such a charter is in legal effect nothing more than a license to enjoy the privilege conferred for the time, and on the terms specified, subject to future legislative or constitutional control or withdrawal.

2. *Trustees of Dartmouth College* v. *Woodward* (4 Wheat. 518) commented upon and explained.

3. The legislature cannot, by chartering a lottery company, defeat the will of the people of the State authoritatively expressed, in relation to the continuance of such business in their midst.

ERROR to the Supreme Court of the State of Mississippi.

The legislature of Mississippi passed an act, approved Feb. 16, 1867, entitled "An Act incorporating the Mississippi Agricultural and Manufacturing Aid Society." Its provisions, so far as they bear upon the questions involved, are as follows: —

"The corporation shall have power to receive subscriptions, and sell and dispose of certificates of subscriptions which shall entitle the holders thereof to any articles that may be awarded to them, and the distribution of the awards shall be fairly made in public, after advertising, *by the casting of lots, or by lot, chance, or otherwise*, in such manner as shall be directed by the by-laws of said corporation; . . . and the said corporation shall have power to offer premiums or prizes in money, for the best essays on agriculture, manufactures, and education, written by a citizen of Mississippi, or to the most deserving works of art executed by citizens of Mississippi, or the most useful inventions in mechanics, science, or art, made by citizens of Mississippi."

Sect. 7 provides that the articles to be distributed or awarded may consist of lands, books, paintings, statues, antiques, scien-

tific instruments or apparatus, or any other property or thing that may be ornamental, valuable, or useful.

Sect. 8 requires the corporation to pay, before the commencement of business, to the treasurer of the State, for the use oᶠ the University, the sum of $5,000, and to give bond and secur: ity for the annual payment of $1,000, together with one-half per cent on the amount of receipts derived from the sale of certificates.

Sect. 9 declares that any neglect or refusal to comply with the provisions of the act shall work a forfeiture of all the privileges granted, and subject any officer or agent failing to carry out its provisions or committing any fraud in selling tickets at drawing of lottery to indictment, the penalty being a " fine not less than $1,000, and imprisonment not less than six months."

Sect. 11 enacts that, as soon as the sum of $100,000 is subscribed, and the sum of $25,000 paid into the capital stock, thᵉ company shall go into operation under their charter and not before, and the act of incorporation shall continue and be in force for the space of twenty-five years from its passage, and that all laws and parts of laws in conflict with its provisions be repealed, and that the act shall take effect from and after its passage.

The Constitution of the State, adopted in convention May 15, 1868, and ratified by the people Dec. 1, 1869, declares that " the legislature shall never authorize any lottery; nor shall the sale of lottery-tickets be allowed ; nor shall any lottery heretofore authorized be permitted to be drawn, or tickets therein to be sold."　The legislature passed an act, approved July 16, 1870, entitled " An Act enforcing the provisions of the Constitution of the State of Mississippi, prohibiting all kinds of lotteries within said State, and making it unlawful to conduct one in this State."

The Attorney-General of Mississippi filed, March 17, 1874, in the Circuit Court of Warren County in that State, an information in the nature of a *quo warranto*, against John B. Stone and others, alleging that, without authority or warrant of law, they were then, and for the preceding twelve months had been, carrying on a lottery or gift enterprise within said county and State under the name of " The Mississippi Agricultural, Educa-

tional, and Manufacturing Aid Society." The information alleges that said society obtained from the legislature a charter, but sets up the aforesaid constitutional provision and the act of July 16, 1870, and avers that the charter was thereby virtually and in effect repealed.

By their answer the respondents admit that they were carrying on a lottery enterprise under the name mentioned. They aver that in so doing they were exercising the rights, privileges, and franchises conferred by their charter, and that they have in all things complied with its provisions. They further aver that their rights and franchises were not impaired by the constitutional provision and legislative enactment aforesaid.

The State replied to the answer by admitting that the respondents had in every particular conformed to the provisions of their charter.

The court, holding that the act of incorpora on had been abrogated and annulled by the Constitution of 1868 and the legislation of July 16, 1870, adjudged that the respondents be ousted of and from all the liberties and privileges, franchises and emoluments, exercised by them under and by virtue of the said act.

The judgment was, on error, affirmed by the Supreme Court, and Stone and others sued out this writ.

*Mr. Philip Phillips* for the plaintiffs in error.

*Mr. A. M. Clayton* and *Mr. Van H. Manning* for the defendant in error.

MR. CHIEF JUSTICE WAITE delivered the opinion of the court.

It is now too late to contend that any contract which a State actually enters into when granting a charter to a private corporation is not within the protection of the clause in the Constitution of the United States that prohibits States from passing laws impairing the obligation of contracts. Art. 1, sect. 10. The doctrines of *Trustees of Dartmouth College* v. *Woodward* (4 Wheat. 518), announced by this court more than sixty years ago, have become so imbedded in the jurisprudence of the United States as to make them to all intents and purposes a part of the Constitution itself. In this connection, however,

it is to be kept in mind that it is not the charter which is protected, but only any contract the charter may contain.  If there is no contract, there is nothing in the grant on which the Constitution can act.  Consequently, the first inquiry in this class of cases always is, whether a contract has in fact been entered into, and if so, what its obligations are.

In the present case the question is whether the State of Mississippi, in its sovereign capacity, did by the charter now under consideration bind itself irrevocably by a contract to permit " the Mississippi Agricultural, Educational, and Manufacturing Aid Society," for twenty-five years, " to receive subscriptions, and sell and dispose of certificates of subscription which shall entitle the holders thereof to " " any lands, books, paintings, antiques, scientific instruments or apparatus, or any other property or thing that may be ornamental, valuable, or useful," " awarded to them " " by the casting of lots, or by lot, chance, or otherwise."  There can be no dispute but that under this form of words the legislature of the State chartered a lottery company, having all the powers incident to such a corporation, for twenty-five years, and that in consideration thereof the company paid into the State treasury $5,000 for the use of a university, and agreed to pay, and until the commencement of this suit did pay, an annual tax of $1,000 and " one-half of one per cent on the amount of receipts derived from the sale of certificates or tickets."  If the legislature that granted this charter had the power to bind the people of the State and all succeeding legislatures to allow the corporation to continue its corporate business during the whole term of its authorized existence, there is no doubt about the sufficiency of the language employed to effect that object, although there was an evident purpose to conceal the vice of the transaction by the phrases that were used.  Whether the alleged contract exists, therefore, or not, depends on the authority of the legislature to bind the State and the people of the State in that way.

All agree that the legislature cannot bargain away the police power of a State.  " Irrevocable grants of property and franchises may be made if they do not impair the supreme authority to make laws for the right government of the State; but

no legislature can curtail the power of its successors to make such laws as they may deem proper in matters of police." *Metropolitan Board of Excise* v. *Barrie,* 34 N. Y. 657; *Boyd* v. *Alabama,* 94 U. S. 645. Many attempts have been made in this court and elsewhere to define the police power, but never with entire success. It is always easier to determine whether a particular case comes within the general scope of the power, than to give an abstract definition of the power itself which will be in all respects accurate. No one denies, however, that it extends to all matters affecting the public health or the public morals. *Beer Company* v. *Massachusetts,* 97 id. 25; *Patterson* v. *Kentucky,* id. 501. Neither can it be denied that lotteries are proper subjects for the exercise of this power. We are aware that formerly, when the sources of public revenue were fewer than now, they were used in some or all of the States, and even in the District of Columbia, to raise money for the erection of public buildings, making public improvements, and not unfrequently for educational and religious purposes; but this court said, more than thirty years ago, speaking through Mr. Justice Grier, in *Phalen* v. *Virginia* (8 How. 163, 168), that "experience has shown that the common forms of gambling are comparatively innocuous when placed in contrast with the wide-spread pestilence of lotteries. The former are confined to a few persons and places, but the latter infests the whole community; it enters every dwelling; it reaches every class; it preys upon the hard earnings of the poor; and it plunders the ignorant and simple." Happily, under the influence of restrictive legislation, the evils are not so apparent now; but we very much fear that with the same opportunities of indulgence the same results would be manifested.

If lotteries are to be tolerated at all, it is no doubt better that they should be regulated by law, so that the people may be protected as far as possible against the inherent vices of the system; but that they are demoralizing in their effects, no matter how carefully regulated, cannot admit of a doubt. When the government is untrammelled by any claim of vested rights or chartered privileges, no one has ever supposed that lotteries could not lawfully be suppressed, and those who manage them punished severely as violators of the rules of social

morality.  From 1822 to 1867, without any constitutional requirement, they were prohibited by law in Mississippi, and those who conducted them punished as a kind of gamblers. During the provisional government of that State, in 1867, at the close of the late civil war, the present act of incorporation, with more of like character, was passed.  The next year, 1868, the people, in adopting a new constitution with a view to the resumption of their political rights as one of the United States, provided that " the legislature shall never authorize any lottery, nor shall the sale of lottery-tickets be allowed, nor shall any lottery heretofore authorized be permitted to be drawn, or tickets therein to be sold."  Art. 12, sect. 15.  There is now scarcely a State in the Union where lotteries are tolerated, and Congress has enacted a special statute, the object of which is to close the mails against them.  Rev. Stat., sect. 3894 ; 19 Stat. 90, sect. 2.

The question is therefore directly presented, whether, in view of these facts, the legislature of a State can, by the charter of a lottery company, defeat the will of the people, authoritatively expressed, in relation to the further continuance of such business in their midst.  We think it cannot.  No legislature can bargain away the public health or the public morals.  The people themselves cannot do it, much less their servants.  The supervision of both these subjects of governmental power is continuing in its nature, and they are to be dealt with as the special exigencies of the moment may require.  Government is organized with a view to their preservation, and cannot divest itself of the power to provide for them.  For this purpose the largest legislative discretion is allowed, and the discretion cannot be parted with any more than the power itself.  *Beer Company* v. *Massachusetts, supra.*

In *Trustees of Dartmouth College* v. *Woodward* (4 Wheat. 518), it was argued that the contract clause of the Constitution, if given the effect contended for in respect to corporate franchises, " would be an unprofitable and vexatious interference with the internal concerns of a State, would unnecessarily and unwisely embarrass its legislation, and render immutable those civil institutions which are established for the purpose of internal government, and which, to subserve those purposes, ought

to vary with varying circumstances" (p. 628); but Mr. Chief Justice Marshall, when he announced the opinion of the court, was careful to say (p. 629), " that the framers of the Constitution did not intend to restrain States in the regulation of their civil institutions, adopted for internal government, and that the instrument they have given us is not to be so construed." The present case, we think, comes within this limitation. We have held, not, however, without strong opposition at times, that this clause protected a corporation in its charter exemptions from taxation. While taxation is in general necessary for the support of government, it is not part of the government itself. Government was not organized for the purposes of taxation, but taxation may be necessary for the purposes of government. As such, taxation becomes an incident to the exercise of the legitimate functions of government, but nothing more. No government dependent on taxation for support can bargain away its whole power of taxation, for that would be substantially abdication. All that has been determined thus far is, that for a consideration it may, in the exercise of a reasonable discretion, and for the public good, surrender a part of its powers in this particular.

But the power of governing is a trust committed by the people to the government, no part of which can be granted away. The people, in their sovereign capacity, have established their agencies for the preservation of the public health and the public morals, and the protection of public and private rights. These several agencies can govern according to their discretion, if within the scope of their general authority, while in power; but they cannot give away nor sell the discretion of those that are to come after them, in respect to matters the government of which, from the very nature of things, must " vary with varying circumstances." They may create corporations, and give them, so to speak, a limited citizenship; but as citizens, limited in their privileges, or otherwise, these creatures of the government creation are subject to such rules and regulations as may from time to time be ordained and established for the preservation of health and morality.

The contracts which the Constitution protects are those that relate to property rights, not governmental. It is not always

easy to tell on which side of the line which separates governmental from property rights a particular case is to be put; but in respect to lotteries there can be no difficulty. They are not, in the legal acceptation of the term, *mala in se*, but, as we have just seen, may properly be made *mala prohibita*. They are a species of gambling, and wrong in their influences. They disturb the checks and balances of a well-ordered community. Society built on such a foundation would almost of necessity bring forth a population of speculators and gamblers, living on the expectation of what, " by the casting of lots, or by lot, chance, or otherwise," might be " awarded " to them from the accumulations of others. Certainly the right to suppress them is governmental, to be exercised at all times by those in power, at their discretion. Any one, therefore, who accepts a lottery charter does so with the implied understanding that the people, in their sovereign capacity, and through their properly constituted agencies, may resume it at any time when the public good shall require, whether it be paid for or not. All that one can get by such a charter is a suspension of certain governmental rights in his favor, subject to withdrawal at will. He has in legal effect nothing more than a license to enjoy the privilege on the terms named for the specified time, unless it be sooner abrogated by the sovereign power of the State. It is a permit, good as against existing laws, but subject to future legislative and constitutional control or withdrawal.

On the whole, we find no error in the record.

*Judgment affirmed.*