THE STATE v. BUTLER et al.

1. CONTRACTS, LEGISLATIVE. *Taxes.* Under the Constitution of 1834, the Legislature had power to grant to incorporations created by it, either partial or total immunity from taxation for any length of time it deemed proper.

2. CORPORATIONS. *May exercise new powers. When.* The State may authorize a corporation to alter its original enterprise and exercise new franchises to any extent without impairing any contract with the corporators. The effect of such a law is merely permissive, and takes away no existing power and affects no existing right.

3. SAME. *Special provision as to taxation of.* The provision in an act of incorporation that the company "shall pay to the State an annual tax of one-half of one per cent on each share of the capital stock subscribed, which shall be in lieu of all other taxes" is valid, and relieves the corporation from all other taxes, State or municipal. Under this provision its real estate necessary for the transaction of its business, is not subject to taxation.

4. SAME. *Charters inviolable.* Neither the Legislature nor a Constitutional Convention has the power to violate the contract between the State and a corporation contained in the charter of the latter.

FROM SHELBY.

Appeal from the Chancery Court at Memphis. W. W. McDOWELL, Ch.

MINOR MERRIWETHER, W. M. RANDOLPH and ATTORNEY-GENERAL LEA for complainant.

FRAYSER & SCRUGGS and TAYLOR & CARROLL for defendants.

COOKE, Sp. J., delivered the opinion of the court.

By an act of the Legislature passed March 20, 1858, the DeSoto Insurance and Trust Company was incorporated with power to conduct a fire and life insurance business, the capital stock not to exceed $300,000.

By the tenth section of said act of incorporation it was provided, "that said company shall pay to the State an annual tax of one-half of one per cent on each share of the capital stock subscribed, which shall be in lieu of all other taxes." By a subsequent act of the Legislature passed February 12, 1869, the president and directors of said company were empowered, upon being authorized by a vote of the stockholders, to discontinue the business of insurance and adopt that of banking, under the name and style of the Union and Planters' Bank of Memphis, with privilege of increasing the capital stock to a sum not exceeding $1,000,000, retaining "all their present rights, privileges

26—VOL. 13.

and immunities, excepting only that of insurance." The stockholders authorized the change, the capital stock was increased to $600,000, a banking institution was organized under the style of the Union and Planters' Bank of Memphis, and has continued to conduct a general banking business ever since. It provided itself with a banking house in Memphis necessary for the conduct of its business, which was paid for out of its capital stock and which it occupies and uses exclusively as its banking house and place of business.

The DeSoto Insurance and Trust Company and the Union and Planters' Bank of Memphis have regularly paid the one-half of one per cent upon each share of the capital stock subscribed as required by section ten of said act of 1858. The capital stock subscribed to the Union and Planters' Bank is now worth one dollar and forty cents on the dollar. The municipality of Memphis assessed said banking house for taxes for the years 1874, 1875, 1876, 1877 and 1878, at the same rate and .in the same manner that other real estate in the city was assessed, and which is standing uncollected upon the tax books of the extinct municipality of Memphis, in the hands of Minor Merriwether, back-tax collector and receiver of said municipality, who is seeking to collect the same. The above agreed state of facts was submitted to the chancellor for adjudication as to the validity of said assessment, and the liability of said bank to pay said taxes. Said Union and Planters' Bank insists, that by virtue of said tenth section of said act of 1858, and their payment of one-half of one per cent upon each share of its capital

stock subscribed, said banking house, etc., are exempt. from said municipal taxes.

For the State it is insisted that said tenth section is in contravention of the Constitution of 1834, which was in force at the dates both of the passage of said acts of 1858 and of 1869, and the organization of said bank thereunder, and also of the Constitution of 1870 and of the bill of rights, and that said tenth section, so far as it attempts to restrict the power of subsequent Legislatures to tax the property of said bank was a nullity, and if the immunity existed under the act of 1858, it was not transferred or continued by the act of 1869, and does not exist in favor of said Union and Planters' Bank.

The chancellor determined the questions submitted in favor of the bank, and the State has appealed.

The main questions submitted and relied upon in behalf of the State have been so often adjudicated and determined both by this court and the Supreme Court of the United States as not to require any further discussion or attempt at elucidation, and the cases are too familiar to require citation. That charters of incorporation are contracts between the State and corporation, the obligation of which cannot be impaired; and that the Legislature had power under the Constitution of 1834 to grant to incorporations created by it either partial or total immunity from taxation for any length of time it deemed proper, has been held by the uniform current of decisions of this court and also of the Supreme Court of the United States, and while this latter power has been se-

riously questioned and dissented from by some of the most eminent jurists. And while it may be conceded that if it were a new question it might well be determined against the power, we concur in the opinion so often announced, that it has been too long settled now to be disturbed. Its practical importance in this State has been greatly lessened by the adoption of the Constitution of 1870. Hence we dismiss this branch of the case without further comment.

It is insisted, however, that if it is granted that the immunity existed under the original act, it only belonged to the corporation as an insurance company, and was not continued to it as a banking corporation under the act of 1869, which was amendatory of the original act. The only changes of the original charter made or authorized by the act of 1869 was the privilege of changing the business of the company from that of insurance to that of banking, to change its name and authorize the increase of its capital stock, expressly retaining "all their present rights, privileges and immunities, excepting only that of insurance." This was not to abolish the original incorporation, or to grant a new charter, or to in any manner restrict the rights or powers originally possessed by it, except as to the business of insurance. "It is evident," says Mr. Morawitz, "that a State may authorize a corporation to alter its original enterprise and exercise new franchises to any extent without impairing any contract with the corporators or between the corporators. The effect of such a law is merely permissive; it enables the corporation

to exercise new powers without breach of the law,. but it takes away no existing power, and effects no existing right": Mor. on Priv. Cor., sec. 455; see also 92 U. S. 665. But if this were not so—the statute by which these changes were authorized expressly reserved to the company as before stated, "all their present rights, privileges and immunities excepting only that of insurance." The principal if not the only immunity possessed by the company was the right to pay one-half of one per cent per annum upon the capital stock subscribed in lieu of all other taxes, and to have immunity from any other or further taxation upon complying with this provision of the charter. And that this immunity was continued to the company in its new business by the express terms of the 21st section of the act of 1869, also, is too well settled to admit of any doubt: *Railroad Co.* v. *Hicks,* 9 Baxt., 442; *Wilson* v. *Gains, Ib.,* 546; *Gaines* v. *Whitworth,* 8 Lea, 594. And it has been so in effect determined both by this court and the Supreme Court of the United States in regard to the indentical charter now under consideration. In the case of *Memphis* v. *Farrington,* 8 Baxt., 539, Farrington was the owner of a number of shares of stock in this identical Union and Planters' Bank, upon which the State assessed taxes, the payment of which was resisted upon the grounds that the shares of stock were exempt under the above cited provisions of the charter.

In the opinion of this court, delivered in that case, it was conceded that under the provisions of the charter the payment of one-half of one per cent had the

effect to relieve or exempt the capital stock of the bank from the payment of any other taxes. But it was held that as there was a distinction between the capital stock of the bank and the shares of stock owned and held by individuals, it was not the purpose of the Legislature to exempt both, and hence the individual shares of stock owned by Farrington were subject to taxation. The cause was taken by appeal to the Supreme Court of the United States, where it was held that the charter was a contract between the State and the bank, and the tax of one-half of one per cent on each share of the capital stock was in lieu of all other taxes, and hence the shares of said capital stock were not subject to any additional tax in the hands of the holder. Hence the judgment of this court was reversed with directions to enter a decree in favor of the stockholders: 95 U. S., 679. While we are aware of the rule that where there is any doubt as to the power to assess the tax, the doubt must be resolved in favor of the power, yet conceding the rule to its fullest extent, standing as this case does, we can not see where there has been any room left for a possible doubt by the direct decisions upon the very questions involved.

That the banking house necessary for and actually used in the conduct of the business of the company is covered by the exemptions: See *DeSoto Bank* v. *Memphis,* 6 Baxt., 415; *Bank of Commerce* v. *McGowan,* 6 Lea, 703.

It is, however, insisted now that inasmuch as the

capital stock of the company was restricted by the original charter to $300,000, and by the amendatory act was allowed to be increased not to exceed $1,000,-000, and was actually increased to $600,000, and as it was their *present* rights, privileges and immunities which were retained, although whatever the immunities the company then had are still possessed by the defendant bank. . Yet it is only applicable to the amount of capital stock it then had, and can not extend to the increased capital stock of the company. We are unable to yield assent to this proposition. In the cases above referred to in which this same charter has been construed no such question was raised or insisted upon, but the immunities of the charter exempting the company from any further or other tax-ation except one-half of one per cent upon each share of its capital stock subscribed, was taken and held to apply to the entire capital stock then subscribed (and which was stated to be $675,000), as well that which was subscribed after as before said amendment of 1869. No question was made as to whether the shares of stock owned by Farrington were subscribed before or after said amendment to the charter, or whether they were of the original or increased capital stock of said corporation.

Again it will be observed that the provision of the original charter was not to pay one-half of one per cent upon $300,000 of capital stock, but while as the charter then was the capital stock was not permitted to exceed that sum, yet the provision was to pay one-half of one per cent upon each share of the capital

stock subscribed, which was to be in lieu of all other taxes, etc.   The amendment simply granted the company the privilege of increasing the capital stock to a sum not exceeding $1,000,000, but the charter immunity of paying one-half of one per cent upon each share subscribed in lieu of all other taxes, was in no manner whatever attempted to be changed or interfered with.   They could have increased it to any amount less or greater than they did not to exceed $1,000,000, or permitted it to have remained as it was, and the obligation to pay simply attached when the shares were subscribed, and upon the amount subscribed.   That the rights vested under the charter in question could not be affected by the Constitution of 1870 is perfectly plain.   As we have seen, it was a contract between the State and the bank, and a convention of a State has no more power than a Legislature to violate the obligation of contracts: 9 Yer, 495; 1 Heis., 284; 4 Wallace, 595.

Other questions have been raised in argument which we deem it unnecessary to notice, as they are all resolved under the principles already announced.   The result is that the chancellor's decree must be affirmed. The parties each will pay one-half the costs.

FREEMAN, J., delivered the following dissenting opinion:

By the act of March 20, 1858, certain parties were incorporated under the name and style of the "DeSoto Insurance Coorpany," with power to conduct a fire and life insurance business.

By the 10th section of the act it was provided that "said company shall pay to the *State* an annual tax of one-half of one per cent on each share of capital subscribed, which shall be in lieu of all other taxes.

By the act of February 12, 1869, this company were empowered to discontinue the business of insurance, and adopt that of banking, under the name of Union and Planters' Bank of Memphis, under which the present banking institution was organized. The exemption contained in the tenth section of the charter of the insurance company may be assumed at present for the purposes of this opinion to have been conferred on the bank in the charter granted. The bank is owner of a valuable banking house in the city of Memphis, purchased with its capital stock, used exclusively for the business of the bank.

This property has been assessed for the years 1874 to 1878, inclusive, for taxes by the late municipality, the city of Memphis, the property being valued variously for the several years ranging from $27,00.) in 1874 to $17,000 in 1878, and the taxes claimed to be due, amounting to several thousand dollars.

The bank having paid the one-half of one per cent to the Comptroller of the State Treasury, claims to be exempt from all other taxes. The rate of taxes for these years on the property of other citizens ranged from $1.80 on the hundred dollars to $3, and is said in subsequent years in the city to have been still heavier.

The question is whether this exemption can be

The State *v.* Butler.

made good under the above cited tenth section of the charter of incorporation. I do not think proper to go into a review of the cases on this question in our own and the Federal courts. They are so familiar to the profession as not to require citation. It is sufficient to say, that it may be considered as settled by the Supreme Court of the United States, that wherever the Constitution of the particular State does not forbid the Legislature from granting such an exemption that it creates a contract in all its essential features, which is protected by the clause of the Constitution forbidding a State from passing any law impairing the obligation of contracts. The protection of this clause, the writer thinks, has been carried to an extreme limit beyond what is justified by sound principles of constitutional exposition. But with this as a judge of a State court at present I have nothing to say. We are called on, however, to say whether our own State Constitution authorizes, or did authorize our own State Legislature to make such a contract as this is contended to be. I think this court is the sole exponent of the constitutional powers of the Legislature of the State under the Constitution. This is in accord with the theory of our American system, both State and Federal, and may properly be denominated its most definitely marked peculiarity, distinguishing it from that of all other systems of government. To yield this, and concede that the courts of the United States, to us in most senses foreign tribunals, should be the exponent of the powers of our State government, is to concede

away the independence of our State government within its well defined sphere of operation, its own territory, for the powers of government confided to the departments of the State government would be only what such foreign courts might hold them to be, and thus our State government practically be dominated by a power from without. Under such a view instead of a free and independent State, we should be a subordinate agency, subjected to the limitations that may be imposed by the views of a tribunal organized and exercising its powers under a different government, it might be with no sympathy with our own system, certainly with no responsibility to our own people.

It suffices to say, that I do not understand the Supreme Court of the United States to have even held (no exceptional element being in the case), that it would disregard the opinions and decisions of the Supreme Court of the State, as to the constitutional powers of its own government, on the contrary the principle has always been, at least in theory if not in fact, conceded that such decisions are conclusive and binding on that court. The case of *Talcott* v. *Township of Pine Grove*, 19 Wall, 666, going further, but that recognizes the general principle but avoids it on the idea of the bonds being negotiable, and the question therefore one of general commercial law. Believing these general views to be correct, and the principles stated sound, I proceed to the examination of the question presented.

The clauses of the Constitution of 1834, under which

the act of 1869 was passed, bearing directly on the question of taxation are as follows, Section 28, Article 11: "All lands liable to taxation, held by deed, grant or entry, town lots, bank stock and such other property as the Legislature may from time to time deem expedient, shall be taxable; all property shall be taxed according to its value, that value to be ascertained n such manner as the Legislature shall direct, so that the same shall be equal and uniform throughout the State, no one species of property from which a tax may be collected, shall be taxed higher than any other species of property of equal value."

Section 29: "The General Assembly shall have power to authorize the several counties and incorporated towns in this State to impose taxes for county and corporation purposes respectively, in such manner as shall be prescribed by law; and all property shall be taxed according to its value, upon the principles established in regard to State taxation."

I remark first, that this case does not present any question on the power of the State under this Constitution to pass by property and not tax it at all; on the contrary it is a case where the State has taxed it, but in a peculiar way, that is by contract, and at a fixed sum, and that for the life of the corporation. In this view the first question is, not so much whether the State might not exempt altogether, but whether the Legislature has the power to tax at all by contract at an agreed sum? If such a contract for taxation be void, beyond the power of the State to make, then the essential element of a contract, the consideration.

fails, and the exemption would have nothing to support it.    By all the decisions of the Federal Supreme Court, a consideration is held necessary in order to uphold such a contract.    In addition, if the consideration of the contract is shown on its face as in this case, and that fails, then the exemption based on it would fail, as it is clear the Legislature based the exemption on the consideration that it had a valid contract with the bank to pay one-half of one per cent on stock subscribed, without this, beyond question the exemption would not have been granted.    If this contract is beyond the constitutional power of the Legislature, then the sole ground on which the exemption clause, as only one term of the contract, must fail with this.

That the article of the Constitution cited by necessary implication forbids taxation by such a contract, or by any contract, seems too clear for argument or question.    The rule is that all property shall be taxed at its value, that value to be ascertained in such manner as the Legislature shall direct, so that the same shall be equal and uniform throughout the State.    To say that an arbitrary agreed tax on the capital stock, of one-half of one per cent, when it is found in the form of a house and lot, is a tax according to this requirement is what we take it, no one would maintain.    In fact the thing done is not intended to be a compliance with the constitutional requirement at all, but is in the nature of a composition of the irregular and uncertain burden of taxation by an agreement, that so far as this property is concerned, it shall only pay the

fixed sum agreed on, be the exigencies of government what they may, and the tax levied on other like property in the State what it may.

We have it stated in brief of counsel that there are nine other banking and insurance corporations in the city with capital of $1,682,000, with no such exemptions, that are compelled to pay taxes at a rate ranging from $3.45 on each hundred dollars, to even as high in one year, 1870, as $5 on the hundred, while this corporation and others with like exemptions only pay one-half of one per cent per hundred dollars. That this is a gross violation of the principle of uniformity and equality in public burdens no one would deny. This is the imperative rule of the Constitution as to all property taxed, and how it could be held that such a contract was consistent with or permissible under such a Constitution, I have never been able to see.

It is true all property is not absolutely required to be taxed, as under the Constitution of 1870, with certain exceptions, but when taxed it is imperatively required to be taxed on the principle of uniformity and equality. That this property is taxed is conceded, and proof given of the fact of payment of this tax. That it is not taxed according to the requirement of the Constitution, but in contravention of it, is beyond question. That this tax in contravention of and forbidden by the Constitution is the basis on which the exemption rests is certain, and without which it would not have been granted, is equally certain. The contract for the consideration being void, the resultant contract must fail.

The State *v.* Butler.

The result would be, that the Legislature has no power to make the precise contract made, or in fact. to make any contract with any one, either corporation or individual, that it or he shall be taxed only at a specified and arbitrary rate, regardless of the value of the property taxed at the time such tax is. laid or assessed.

No one denies that the rule of the Constitution is uniformity and equality as to all property taxed,. and that this rule is based on the principles of justice and fairness to all the citizens of the State. The principle underlying it is, that taxes are a compensation for the protection given by government both to person and property, therefore the latter should pay in proportion to the value of the property protected. The rule given in the Constitution is not only violated, but the very principle on which the rule rests subverted by the exemption claimed in this case. It. is said, and we take it to be true the market value of the stock in this particular bank $140 per share of $100, showing that there is no proportion between the value of the property protected and the burden. imposed, as compared with burdens imposed on other property of the State, in this case, and aptly illustrating the violation of the rule of uniformity as required by our Constitution. That this is a direct violation of the Constitution, I cannot doubt. The principle is axiomatic, one that needs no argument or authority to sustain it, that the affirmative prescriptions of the Constitution forbid the opposite of what is therein prescribed. The rule is thus stated by

Judge Catron in *Norment* v. *Smith,* 5 Yer., 272:
" Whenever a State Constitution prescribes a particular
manner in which power shall be executed, it prohibits
every other mode of executing such power. On that
particular subject, the authority is exhausted by the con-
stitutional provision, and an attempt to render it nuga-
tory by law, would be an attempt at repeal ": *Lynn* v.
*Polk,* 8 Lea, 160 ; *People* v. *Draper,* 15 N. Y., 543.
With this principle before us, the only question is
whether the Constitution shall prevail or the act of
the Legislature? a question to which there is but one
answer.

The principle of the rule of uniformity and equal-
ity cannot be better stated than we find it in Burroughs
on Tax., sec. 51: " The general idea conveyed by
these provisions is, that taxes shall be assessed accord-
ing to some ratio or rule of apportionment, so that
A shall pay upon a piece of property of a certain
value, the same amount as B upon a similar piece
of property of equal value. To compel individuals
to contribute money or property for public use with-
out reference to any common ratio, and without re-
quiring the sum paid by one piece of property, or
by one person, to bear any relation whatever to that
paid by another, would be forced contribution, not a
tax, within the sense of that term as applied to the
exercise of power by an enlightened government."

It is true this principle comes mainly into play
where a tax is directly imposed on particular prop-
erty in violation of the rule, but equally reaches to
this case, because what this party is exempted from

paying is to be borne by others less favored, and their burdens thereby increased, and thus the inequality works its evil consequence on all. It suffices, however, that it plainly is in the face of the Constitution of the State, and therefore the contract one beyond the power of the Legislature to make. This being so, I am compelled as a judge of this court, expounding the Constitution of my own State, to hold the exemption claimed void. If these views should prevail here the question can again be brought for review before the Supreme Court of the United States. That high tribunal has never held doctrines contravening the principle I have maintained except by a divided court. It is a question involving so much of vital interest to the people of this country, and becoming every day of more vital concern, that it can hardly be considered as settled or closed by judicial decisions against it. I deem it my duty to make an effort to have the question again reviewed by that court before I, as a State judge, can yield to what has already been done and said on this question. While I concede many of the cases in that court are based on a theory contrary to what I deem sound in this question, yet in other directions that court has followed lines of thought, and embodied them in their later decisions, that seem to me logically to involve a modification of their former holdings on the question now under consideration.

I hold with Judge Miller, and the other dissenting judges, in familiar cases, that the Legislature has no power to bargain away the vital power of taxa-

27—VOL. 13.

tion without which no government can exist. That this is a question of power, and not the extent to which it may be exercised, and that if the power exists to exempt one species of property from taxa-tion, or to grant such exemption to one class, then the same may be done as to every species, or to any number of individuals or corporations, and thus our Legislature may destroy the life of the State. Whenever you concede the power, there is no limit to its exercise. It goes then outside the sphere of judicial action, and falls within the sphere of the Legislature, and at once becomes an unlimited power, with no restraint whatever upon the extent of its exercise.

The principle on which the case of *Stone* v. *Mississippi* rests (101 U. S., 814 to 820), as given in note to Cooley Const. Lim., opinion of Chief Justice Waite, if carried to its logical result, or applied to the facts of the present case, is conclusive in favor of the proposition for which I contend. It is "the power of governing is a trust committed by the people to the government, no part of which can be granted away. The people in their sovereign capacity have established their agencies for the preservation of the public health and the public morals, and the protection of public and private rights. These several agencies can govern according to their discretion, if within the scope of their general authority while in power, but they cannot *give away* nor sell the discretion of those that come after them in respect to matters the government of which, from the very nature of things, must vary with varying circumstances."

I am aware that this was said with reference to that undefined region of our law known as the "police power," but it is applicable with far more force to a contract giving away or selling the power of taxation. This is a power without which the police power ceases to be of use, for the latter can only be exercised through the official agencies of the government, and these depend for their continued existence on the untrammeled exercise of the taxing power. If the taxing power is "sold or given away," then the other power that cannot be sold or given away becomes lifeless, so that in fact to "sell or give away" the taxing power is practically to destroy the other, which is now declared to be beyond the sphere of contract. If you cannot sell or bargain away the police power, it follows, inevitably, you cannot sell or give away that on which it depends for its continued life. This would be to hold you could not give away or sell directly, but the same thing thus forbidden could be effectually done by only going back one step and selling that on which the police power depended, and this would be legitimate. Besides, the taxing power is one needing above all others to be free, because it is one by its very nature that must be exercised on ever varying circumstances of need by the State. This is peculiarly so in this country, where the value of property is subject to more fluctuation than in any other country of the world by reason of the speculative spirit of our people, born largely of the advantages of soil and climate, with other favorable conditions enjoyed by them, not the

least of which are the freedom guaranteed by their written constitutions, protected from infringement by what should ever be the watchful vigilance of an enlightened and independent judiciary. We need but point to the fact that in one year the property of this State, from September 1873 to 1874, probably shrank in value a hundred millions—certainly within two years such was the fact. If half or one-third of that property had been protected from the burdens thus falling on this lower value with the demands of government grown large by the previous years of prosperity, all can see how oppressively it would operate on the masses having no such exemptions. If the principle contended for be carried to its logical result such a state of things might well have existed. In fact, if we could get a full cash estimate of all the property in banking, insurance and railroad corporations exempt at that period, it would probably not have fallen far short, if any, of one-third the taxable property of the State.

But the principle that a power to be exercised under varying circumstances necessary to the continued existence, and not simply the well-being of the State, can never be given or bargained away, absolutely forbids the construction of our organic law that will permit such a contract to stand.

I do not deem it necessary in this opinion to review our own cases on this question. The first case *Bank* v. *The State*, 9 Yer., was under a law passed before the Constitution of 1834. In all the other cases it will be found that the principle herein com-

batted was either assumed, but not necessarily decided, and if acquiesced in, was done under protest, on the assumption that the decisions of the Supreme Court of the United States compelled it, or else involved the element of an exemption of a railroad company in which another clause of the Constitution came into play, towit: sec. 10 of Art. 11, authorizing the Legis- lature to encourage a well regulated system of inter- nal improvements. It would appear that at least one way to encourage would be to relieve from taxation for a reasonable period, or it may be plausibly argued, if the Legislature could aid or encourage by direct grants of State aid, as it has done, these grants to be met by taxes, then it could as well do so by allowing them to retain the taxes which they other- wise would have to pay. On this ground I have acquiesced reluctantly in admitting such exemptions in favor of railroad corporations.

. I need but to say this exemption cannot be sus- tained under the power " to grant such charters of incorporation as they may deem expedient for the public good," as this can never be held to authorize the making of a contract with such a corporation in violation of other clauses of the Constitution, as we held in the *Overton Hotel* case, 12 Heis. R.

This argument might be indefinitely enlarged, but I deem this sufficient to present the basis of my ob- jection to the exemption claimed. In view of the fact that the present Supreme Court of the United States is composed, a majority of them, of men who have not been called on as yet to meet this direct

---

The State *v.* Butler.

---

question, where the exemption is in favor of a trading, moneyed corporation alone, and the later views of that court, in such cases as *Stone* v. *Mississippi,* I feel it a duty I owe to my own State and her people, to make an earnest effort to again have the question passed on by that high tribunal.

For these reasons, and others that might be given, I am compelled to dissent from the ruling of the majority.