## THE STOCKTON LAUNDRY CASE.

### *In re* TIE LOY.

*(Circuit Court, D. California.* February 16, 1886.)

1. **CONSTITUTIONAL LAW — FOURTEENTH AMENDMENT — CITY ORDINANCE — DUE PROCESS OF LAW — PRIVILEGES AND IMMUNITIES OF CITIZENS OF UNITED STATES — EQUAL PROTECTION OF LAWS.**

   A city ordinance that makes it an offense for any person to carry on a laundry where clothes are washed for pay, within the habitable portion of the city, is unconstitutional.

2. **HABEAS CORPUS — VIOLATION OF UNCONSTITUTIONAL CITY ORDINANCE — REV. ST. U. S. § 753.**

   A party who is held in custody for the violation of a city ordinance that is in conflict with the fourteenth amendment to the United States constitution is entitled to be discharged on *habeas corpus.*

On *Habeas Corpus.*

*R. W. Bennett,* for petitioner.

*F. H. Smith,* City Atty. of the City of Stockton, and *Alfred Clarke,* for respondent.

SAWYER, J. The petitioner is in custody upon a charge of violating the provisions of an ordinance of the city of Stockton, which reads as follows:

"Section 1. The establishment of public laundries and public wash-houses, where clothes and other articles are cleansed for hire, within those portions of said city, other than the portions hereinafter especially mentioned, being injurious and dangerous to public health and public safety, and prejudicial to the well-being and comfort of the community, it shall be unlawful for any person or persons to establish, maintain, carry on, or conduct, or cause to be established, maintained, carried on, or conducted, any public laundry or public wash-house, within any portion of the city of Stockton other than that portion of said city lying west of Tule street and south of Mormon channel."

"Sec. 7. Any person violating any of the provisions of this ordinance shall be punished by a fine of not more than five hundred dollars, or by imprisonment not exceeding three months, or by both such fine and imprisonment."

This ordinance is much broader in its scope than any heretofore considered by this court. It absolutely and unconditionally forbids the keeping of a laundry for washing clothes for hire, at any point within the inhabited, and even within the habitable, part of the city of Stockton; the remainder of the city being in the uninhabitable marshes and sloughs. The isolated position of the laundry, the character of the structure, and the perfection or imperfection of the appliances for rendering the operation safe and free from unwholesomeness and offensiveness to the senses are not factors to be considered under the ordinance. All must go, safe or unsafe, healthy or unhealthy, offensive or not offensive. It makes no difference what the character of the work is. No decision of any court in this state or elsewhere has been brought to the notice of the court holding an ordinance so sweeping and exclusive in its provisions to be valid, since

or even before the adoption of the fourteenth amendment to the national constitution. In my judgment, the *Case of Yick Wo*, 9 Pac. Rep. 139, recently decided by the supreme court of California, cited the other day in *Wo Lee's Case*, *ante*, 471, does not reach it, either in its facts or the principles involved. This ordinance does not regulate,—it extinguishes. It absolutely destroys, at its chosen location, an established ordinary business, harmless in itself, and indispensable to the comfort of civilized communities, and which cannot be so conveniently, advantageously, or profitably carried on elsewhere. On the other hand, it appears to the court that it is fully covered by the case of *Yates* v. *Milwaukee*, decided by the supreme court of the United States, 10 Wall. 505, which is authoritative. In that case the court says:

"The mere declaration by the city council of Milwaukee that a certain structure [a wharf] was an encroachment or obstruction did not make it so; *nor could such declaration make it a nuisance unless it in fact had that character. It is a doctrine not to be tolerated in this country that a municipal corporation, without any general laws, either of the city or of the state, within which a given structure can be shown to be a nuisance, can, by its mere declaration that it is one, subject it to removal by any person supposed to be aggrieved, or even by the city itself. This would place every house, every business, and all the property of the city at the uncontrolled will of the temporary local authorities.*"

If the rural city of Stockton, which, as usual in such cities, is, in the greater part, not compactly built up, has authority to prohibit, within its inhabited limits, the washing of clothes for hire,—not only a useful but an absolutely necessary occupation in any civilized community,—it is because it has the power to declare that occupation and every other that may be followed by civilized man to be a public nuisance, without regard to the question whether it is in fact a nuisance or not. That is just what the supreme court of the United States says it cannot do. If the city of Stockton can prohibit the washing of clothes for hire within its inhabited and habitable limits, it can prohibit the washing of clothes by any citizen, for him or herself, anywhere within the city of Stockton. Washing *for hire* cannot make the operation a nuisance if it be not otherwise a nuisance. One may cook his dinner in such manner and under such conditions as to render the operation extremely dangerous, and constitute it a nuisance. Unfortunately, this necessary and ordinarily harmless act has sometimes been so performed as to be dangerous. Does it follow from this fact that all the inhabitants of the city of Stockton may, under the police power of the state, be lawfully prohibited from cooking their meals within the habitable limits of that city? It is not apparent why they may not be thus prohibited if this ordinance be valid under the power invoked, or any other power. Indeed, if this ordinance be valid, it is difficult to perceive what rights the people of California have which a municipal corporation is bound to respect. Of course, no one can in fact doubt the purpose of this ordinance. It

means, "The Chinese must go;" and, in order that they shall go, it is made to encroach upon one of the most sacred rights of citizens of the state of California,—of the Caucasian race as well as upon the rights of the Mongolian. It should be remembered that the same clause in our constitution which protects the rights of every native citizen of the United States, born of Caucasian parents, equally protects the rights of the Chinese inhabitant who is lawfully in the country. When this barrier is broken down as to the Chinese, it is equally swept away as to every American citizen; and in this instance the ordinance reaches American citizens as well as Chinese residents.

This occupation is not a nuisance *per se*, nor one that is *prima facie* a nuisance,—like a slaughter-house, a house for the manufacture or storage of gunpowder or dynamite, or many others that might be mentioned. It can only become a nuisance upon gross negligence or carelessness, or gross imperfections in the arrangements and appliances by means of which it is carried on. It is one of the most common, ordinary, and necessary employments, in which every one may engage, as of common right, upon terms of equality, not only as to this employment, but upon terms of equality with those who engage in any other ordinary, necessary, or useful occupation. Cleanliness is necessary to civilization,—necessary to the health, comfort, and happiness of a civilized people. Without it, every man, woman, and child would individually, him or herself, become a nuisance to his or her neighbor. The right to labor in this or any other honest, necessary, and in itself harmless calling, where it can be the most conveniently, advantageously, and profitably carried on without injury to others, is one of the highest privileges and immunities secured by the constitution to every American citizen, and to every person residing within its protection.

In *Ward* v. *Maryland* the United States supreme court observes:

"Beyond doubt these words [privileges and immunities] are words of very comprehensive meaning; but it will be sufficient to say that the clause plainly and unmistakably secures and protects the rights of a citizen of one state to pass into any other state of the Union for the purpose of *engaging in lawful commerce, trade, or business without molestation*, to acquire personal property, to take and hold real estate," etc. 12 Wall. 430.

So, in the *Slaughter-house Cases*, Mr. Justice FIELD remarks upon these terms:

"*The privileges and immunities designated* are those which of right belong to citizens of all free governments. *Clearly, among these must be placed the right to pursue a lawful employment in a lawful manner, without other restraint than such as equally affects all persons.*" 16 Wall. 97.

Justice BRADLEY, in discussing the question as to what is embraced in the privileges and immunities secured to citizens, among other equally pointed and emphatic declarations, says:

"*In my judgment, the right of any citizen to follow whatever lawful employment he chooses to adopt (submitting himself to all lawful regulations) is one of the most valuable rights, and one which the legislature of a state can-*

*not invade, whether restrained by its own constitution or not.*"    16 Wall. 113, 114.

He also enumerates, as among the fundamental rights embraced in the privileges and immunities of a citizen, all the absolute rights of individuals classed by Blackstone under the three heads: "The right of personal security, the right of personal liberty, and the right of private property." Id. 115. And in relation to these rights he says:

"In my view, a law which prohibits a large class of citizens from adopting a lawful employment, *or from following a lawful employment previously adopted, does deprive them of liberty, as well as property, without due process of law. Their right of choice is a portion of their liberty. Their occupation is their property. Such a law also deprives those citizens of the equal protection of the laws, contrary to the last clause of the section.*" Id. 122.

And Mr. Justice SWAYNE supports this view in the following eloquent and emphatic language:

"*Life is the gift of God, and the right to preserve it is the most sacred of the rights of man. Liberty is freedom from all restraints but such as are justly imposed by law. Beyond that line lies the domain of usurpation and tyranny. Property is everything which has an exchangeable value, and the right of property includes the power to dispose of it according to the will of the owner. Labor is property, and, as such, merits protection. The right to make it available is next in importance to the rights of life and liberty. It lies, to a large extent, at the foundation of most other forms of property.*" 16 Wall. 127. See *Parrott's Case,* 6 Sawy. 373; S. C. 1 Fed. Rep. 481.

The police power is invoked to sustain this ordinance, but the police power only extends to the regulation of the necessary pursuits of man, so that they shall not become, in their mode of exercise, unhealthy, noisome, dangerous, or otherwise destructive or injurious to the common interests of the community. It does not extend to the destruction or driving to inconvenient and unprofitable localities of necessary or useful occupations, carried on in such manner as to be harmless. It is not easy to define the police power by general terms, in advance, so that it will embrace every case that ought to be embraced, and exclude every case that ought to be excluded. In the recent case of *New Orleans Gas-light Co.* v. *Louisiana Light & Heat, etc., Co.,* 6 Sup. Ct. Rep. 252, the supreme court observes:

"In the *Slaughter-house Cases,* 16 Wall. 62, it was said that the police power is from its nature incapable of any exact definition or limitation; and in *Stone* v. *Mississippi,* 101 U. S. 818, that 'it is easier to determine whether particular cases come within the general scope of the power than to give an abstract definition of the power itself, which will be in all respects accurate.'"

And the court then added:

"*Definitions of the police power must, however, be taken subject to the condition that the state cannot, in its exercise, for any purpose whatever, encroach upon the powers of the general government, or rights granted or secured by the supreme laws of the land,* * * * [*and, under color of the police power*] *objects not within its scope cannot be secured at the expense of the protection afforded by the federal constitution.*" 6 Sup. Ct. Rep. 258.

It does not appear to me to be difficult to determine that this sweeping, exclusive, destructive, prohibitory ordinance, making it an offense to pursue one of the most ordinary and necessary occupations, without regard to the manner of its pursuit, or the character of the appliances with which it is carried on, is not within the police power of the state. To hold otherwise would, in my judgment, clearly be, under color of the police power, to take in "objects not within its scope" which "cannot be secured at the expense of the protection afforded by the federal constitution," and to "encroach upon   *   *   * rights granted and secured by the supreme law of the land," which the supreme court says cannot be done. If the foregoing extracts from the opinions of the justices of the supreme court give a correct idea of the privileges and immunities protected by the constitution of the United States, then this ordinance in question, it seems to me, violates that clause of the fourteenth amendment which says: "No state shall *make* or *enforce any law which shall abridge the privileges or immunities of citizens of the United States;*" for this ordinance does absolutely prohibit, not only Chinese, but citizens of the United States, from following, within the inhabited part of the city of Stockton, under any circumstances, one of the most ordinary, necessary, and, when properly conducted, harmless, occupations of civilized man.

Under the same definitions, this ordinance also violates the clause which secures the personal liberty of the citizen. So, also, as the laundrymen have already fitted up their laundries suitably for the purpose, and established their business, to now drive them out to inconvenient and unsuitable localities would be to limit the use of their property and convert it to other purposes and uses to which it is unfitted, and, to that extent, deprive them of their property and its use without due process of law, in violation of the last clause of section 2 of said amendment. So, also, to thus drive the laundrymen unconditionally out of Stockton, while other parties are entitled to wash clothes not for hire, and where other parties are entitled to pursue other ordinary and no more necessary or less harmful occupations, is to deprive them of the equal protection of the laws, within the meaning of the same inhibitory clause. Thus it seems clear to my mind that this ordinance violates the constitution of the United States in all the particulars indicated, and that it is utterly void. If so, the petitioner is "in custody in violation of the constitution of   *   *   * the United States," within the meaning of section 753 of the Revised Statutes, and he must be discharged.

The respondent relies upon article 11, § 11, of the state constitution, to sustain the ordinance, which provides that "any county, city, etc., may make and enforce within its limits all such local police, sanitary, and other regulations *as are not in conflict with general laws;*" also the first clause of section 524 of the Acts of 1883, relating to cities of the class in question, giving power "to pass ordinances *not in*

*conflict with the constitution and laws* of the state *or of the United States;*" and section 530, authorizing the common council to define nuisances.    Laws 1883, pp. 211–214.    But if the views presented are correct, this ordinance is not a "regulation," but a "destruction," of a lawful business, at the location selected for carrying it on, and does not fall within the police power of the state, and is "in conflict with general" and the supreme "law" of the land,—the national constitution,—and is not within any lawful power so conferred· by either the state constitution, or statutes of the state.

In pursuance of the views expressed, the petitioner must be discharged; and it is so ordered.