### FLORIDA REAL ESTATE COMMISSION v. EVERETT.
#### No. 33399.

Circuit Court, Orange County, Civil Appeal.

September 8, 1958.

John A. Sutton, Orlando, and Joseph E. Johnston, Jr., Brooksville (on rehearing), for appellant.

Frank A. Wilkinson, Orlando, for appellee.

W. A. PATTISHALL, Circuit Judge.

The Florida Real Estate Commission, proceeding under chapter 475, Florida Statutes, permitted the filing of an information by its authorized representative against appellant James C. Everett charging that he had been guilty of a crime against the laws of the

state of Florida involving moral turpitude, to-wit, possession of lottery tickets evincing an interest in a lottery scheme commonly known as Cuba or Bolita, and had been convicted thereof on a plea of guilty and sentenced to ten months in jail and a fine of $3,500. Motion to quash the information was filed and the commission denied the same, and this appeal is from that order.

The sole question presented by this appeal is whether or not the crime of possession of lottery tickets, of which appellant was convicted on his plea of guilty, is one involving moral turpitude. The question has been ably presented by counsel for appellant and for the commission, in briefs as well as in oral argument before this court. On the question of moral turpitude, 14 Am. Jur., section 5, page 757, says—". . . an act of baseness, vileness or depravity in the private and social duties which a man owes to his fellow men or to society in general may evidence moral turpitude. An act involving the violation of a rule of public policy and morals may involve moral turpitude." While there is no lack of definitions of "moral turpitude", it seems to be agreed that there are very few reported cases which can be considered very helpful in applying the definitions to the situation here presented.

The Florida constitution prohibits lotteries in this state, and section 849.09, Florida Statutes, implements this by making it unlawful, among other things, for any person to have any lottery ticket in his possession. Conviction of the first violation is punishable as a misdemeanor but any subsequent violation as a felony.

Counsel for appellant contends that the crime of which appellant was convicted is a crime *mala prohibita* and not a crime *mala in se,* which is the Latin way of saying that it is a crime because the law makes it so and not because it is wrong in itself. He argues forcefully that because it is an act prohibited by statute which our courts have held does not require proof of a criminal intent, it is impossible for it to involve moral turpitude, the very meaning of which involves intent and requires some wilful act on the part of a person.

In Lee v. City of Miami, 163 So. 486, our Supreme Court had before it the question whether the "slot machine" statute violated the constitutional prohibition against lotteries. The opinion by Justice Terrell includes a very helpful history of lotteries, a part of which follows—

"Lotteries are of ancient origin. They were common in the festivals of Roman emperors, were used by the feudal princes of Europe, by the courts of Louis XIV, and were appropriated in the Italian republics of the sixteenth century to encourage the sale of merchandise. They early became popular in France,

Belgium, Sweden and Switzerland as a means of raising government funds. They were established in England as early as 1569, and were one of her most popular sources of revenue. They were at one time employed in every state of the Union and in the District of Columbia to raise money for public purposes, the erection of buildings, making public improvements, for educational and sometimes for religious purposes. In 1828 the territorial Legislature of Florida created Union Academy in Jackson county and authorized its trustees to raise $1,000 for its benefit by lottery. Page 279, Acts of 1828. During the Revolution the Continental Congress on one occasion authorized the raising of funds by lottery. Stone v. State of Mississippi, 101 U. S. 814, 25 L. Ed. 1079.

"Under the common-law, lotteries and all forms of gaming were pronounced illegal only when they became public nuisances. In 1698 an act of Parliament declared the former to be such. In Great Britain and in every state in the United States they have been suppressed by constitutional provision as the result of popular uprising against them early in the latter half of the preceding century."

In Jarrell v. State, 185 So. 873, where the appellant had been convicted of conducting a lottery commonly known as Cuba, our Supreme Court said—"The constitution and the statute express a fixed policy of the State and are designed to make a lottery of any kind unlawful; and to impose punishment upon any one who in any way violates the statutes on the subject."

In Phalen v. Virginia, 8 How. (U. S.) 163, 168, 12 L. Ed. 1030, the Court has this to say about lotteries—"Experience has shown that the common forms of gambling are comparatively innocuous when placed in contrast with the wide-spread pestilence of lotteries. The former are confined to a few persons and places, but the latter infests the whole community; it enters every dwelling; it reaches every class; it preys upon the hard earnings of the poor; it plunders the ignorant and simple."

In Ford v. State, 85 Md. 465, 37 Atl. 172 (1897), the court was dealing with the statutory crime of possession of lottery tickets, and in considering the validity of the statute the Maryland Court of Appeals observed—

"If it be necessary to refer to any authority to show that the laws for the suppression of lotteries are regarded by the courts to be in the interest of the morals and welfare of the people, the cases of Ballock v. State, 73 Md. 1, 20 Atl. 184, and Stone v. Mississippi, 101 U. S. 814, will suffice to give the views of the supreme court of the United States and of this

court on that subject. There probably never was a time in the history of this state when it was more necessary than the present to use all legitimate means to stamp out this and kindred evils, which are demoralizing so many who might otherwise be useful and honest citizens. The man that is always looking for greater returns than his investment or efforts justify is generally a useless, if not a dangerous, member of society and a lottery is said to be 'a game in which small sums are ventured for the chance of obtaining a larger value.' It is not difficult to see why one given up to that sort of business soon becomes worse than useless to his community. The tendency is to make him idle, and idleness easily begets crime. Families are deprived of the comforts, and sometimes necessaries of life which are due them, because those who should provide them either squander their means in pursuit of such gains, or have had their powers of earning paralyzed by the pernicious habit of this form of gambling."

Whether or not a crime involves moral turpitude must be determined in the light of the prevailing "public morality" at the time under consideration. The private and social duties which a man owes to his fellow men, or to society in general may vary with the times. Social responsibilities and moral standards are ever changing. A century ago lotteries apparently wore the cloak of respectability in our country, but as indicated by the courts in the cases referred to above, society rebelled against them and we think the people of the state of Florida evidenced their rebellion and disapproval in providing in the constitution of 1868 in unmistakable language that lotteries are prohibited, and this provision was carried forward into the constitution of 1885 and of course is still in effect. We attach some significance to the fact that the people of Florida inserted this prohibition in the constitution rather than leaving it to legislative action. Our study of the history of lotteries which flourished for a time in this country and then state by state were prohibited, leads to the inescapable conclusion that our people in banning lotteries by constitutional enactment were but expressing their profound conviction gained from experience with them that lotteries offend public morals and debase and degrade whole communities and people generally, and they wanted no part of it. We believe that same situation has continued down to the present time.

There are no doubt varying degrees of moral turpitude, depending upon the offensiveness of the particular act involved, but it does not remove the stigma of participation in a lottery to say that the mere possession of a lottery ticket is not nearly so bad as the sale of them. The provision of the statute making the possession of

a lottery ticket a crime is only a part of the statute that is undoubtedly an attempt to spell out all phases of the operation of a lottery and make participation in them crimes. If society in general condemns lotteries as detrimental to the moral and well-being of people, then every part essential to its operation is wrong and offends society.

In applying the definition of moral turpitude to this case, we cannot overlook the fact that both custom and the statute hold a real estate broker to a very high standard of integrity and morality. In his dealings with the public he is entrusted with large sums of money belonging to other people. In proceedings under the statute to inquire into the question whether his license should be revoked or suspended on the ground of his being guilty of a crime involving moral turpitude, consideration must be given to these facts.

Our ruling is that the crime of possession of a lottery ticket involved moral turpitude, so that the motion to quash the information was properly denied, and the order appealed from is affirmed.