STEHMEYER v. CITY COUNCIL OF CHARLESTON.

CORNELIA REAL ESTATE COMPANY v. SAME.

1. CHARLESTON LIGHT AND WATER COMPANY.—THE CITY OF CHARLES-
   LESTON is a duly incorporated municipality, and the Charleston Light
   and Water Company is a duly incorporated organization.

2. CONTRACTS—WATER WORKS—STREETS.—THE CITY COUNCIL OF
   CHARLESTON has violated the provisions of the act of 1881 (17 Stat.,
   582), in executing the contract with the Charleston Light and Water
   Company.                                                           *L*

3. POLICE POWER is that attribute of sovereignty in a State by which it
   clothes the legislature with power to regulate persons and property
   in accordance with the provisions of the State Constitution in all
   matters relating to the public health, morals and safety.

4. WATER WORKS — TAXATION — CONSTITUTION — STREETS — LIGHT
   PLANTS.—A CITY under our present Constitution has no right to
   enter into a contract for the purchase of water works and light
   plants to be paid for by a scheme of taxation to be laid on lot
   owners whose lots abut the streets in which the water pipes are laid.

Proceeding in the original jurisdiction of this Court by
Diedrich Stehmeyer *v.* the City Council of the city of
Charleston and the Charleston Light and Water Company,
and the Cornelia Real Estate Company and the Queen In-
vestment Company *v.* the Same, for perpetual injunction
to restrain the city council from carrying out an executed
contract with the Charleston Light and Water Company to
establish a system of water works and a light plant to be
purchased by the city.

*Messrs. McCradys & Bacot,* for petitioner, Stehmeyer.

*Messrs. Mitchell & Smith* and *Mordecai & Gadsden,* for
petitioner, Cornelia Real Estate Company.

*Messrs. W. C. Miller* and *Geo. S. Legare,* for Charleston
Light and Water Company, and *J. K. P. Bryan,* for city
council of Charleston.

Sept. 30, 1898. The opinion of the Court was delivered by

MR. JUSTICE POPE. The two preceding causes, although
separate and distinct, are brought before this Court, in the
exercise of its original jurisdiction, to perpetually enjoin the

city council of Charleston from carrying into effect a contract in writing made by it with the Charleston Water and Light Company, a corporation of this State, for the construction of a system of water works, by which a stream of water, taken from the Edisto River, shall be supplied to the city of Charleston, to supply not less than 7,000,000 gallons daily, and also said Water and Light Company shall supply said city with electric lights; and inasmuch as they involve substantially the same issues, they have been heard together. In order that we may pass upon these issues intelligibly, we will reproduce the contract in question in its entirety:

State of South Carolina: This agreement, made and entered into this 10th day of May, A. D. 1898, by and between the Charleston Water and Light Company, a corporation duly organized under the laws of the State of South Carolina, party of the first part, and the City Council of Charleston, of the said State, party of the second part, witnesseth: First. That in consideration of the promises and covenants of the party of the second part herein set forth, the said the Charleston Water and Light Company, party of the first part, hereby covenants and agrees: 1. That it will build and construct a system of water works, complete, and in all respects adequate to the needs and requirements of the said city of Charleston and its inhabitants, as follows, to wit: The source from which the supply of water shall be obtained shall be the Edisto River, to be taken therefrom at or near a point known as. Givhan's Ferry. The water shall be conveyed to the city by a suitable conduit of sufficient size and capacity to deliver not less than 7,000,000 gallons of water per twenty-four hours into a reservoir at some suitable point within the city limits. The reservoir capacity to be provided shall not be less than 15,000,000 gallons. The distribution system shall consist of not less than fifty miles of pipe lines from four to twenty-four inches in diameter. It shall be standard cast iron water pipe, of hub and spigot pattern, tested to 300 pounds per square inch at the foundry where manufactured, coated with a preservative mix-

ture, and in every detail of manufacture and quality to conform to standard practice.   The laying of the pipe line shall be executed in a thorough and workmanlike manner in accordance with best standard practice, all street surfaces over pipe ditches to be restored to their original conditions as near as practicable, and the laying of the mains to be done in a manner and method to least inconvenience the traveling public in the legitimate uses of the streets.   A standpipe of sufficient height to maintain, when full, a pressure of forty pounds on the distribution mains in any and all parts of the city shall be erected and connected with the pipe system.   Under the pipe distribution system there shall be placed a full complement of gates and not less than 600 standard fire hydrants, so distributed as to render the greatest service.   The pumping and power station shall be of suitable dimensions, and built as nearly fireproof as practicable.   The machinery equipment shall consist of duplicate steam plant and pumping machinery of economic and modern design, with an aggregate capacity of not less than 12,000,000 gallons per twenty-four hours.   The water, before being delivered to the distributing pipes, shall undergo filteration by a modern and effective process.   2. That it will establish, erect, and install an electric street lighting system, complete, modern and standard in all respects.   The capacity of the plant shall be suitable for operating not less than 400 1,200 candle power arc lamps, or their equivalent in larger or smaller units, said lights to be so distributed throughout the city as to give the most effective service. The plan of distributing the electric current to the lamps shall be either "overhead or pole line" construction, or the wires shall be strung in underground conduits, as may be elected by the said city council.   3. That both of said constructions shall and will be done by said party of the first part, under the supervision of the board of water and light commissioners hereinafter provided, and to the reasonable satisfaction of them in accordance with the above specifications.   4. That, in so far as practicable, bids for work to be

done thereon or for materials to be furnished therefor, as well as for bonds to be financed, shall be invited through one or more daily papers published in the city of Charleston. 5. That for the costs and expenses incurred by the party of the first part, including a percentage of one-half per cent. on all moneys expended hereunder, as profit to said party of the first part, with the approval of said board of water and light commissioners, in the erection of said plants and the financing of the bonds herein referred to, and in every other thing which may be required of it hereunder, it, the party of the first part, shall and will issue its bonds, payable thirty years after date, with interest thereon at the rate of five per cent. per annum, payable semi-annually, with the privilege of retiring same at any time after fifteen years, upon the insertion of a six months notice to that effect in a daily paper published in Charleston, and the payment of the principal and accrued interest on same, or the deposit of this amount with the mortgage trustee. Each and every bond so issued shall be certified by the board of water and light commissioners hereinafter mentioned, under its seal, attested by its secretary, and registered as herein provided; said issue of bonds, however, not to exceed $1,000,000. 6. That for the better security of said bonds issued by the party of the first part and certified by the said board of water and light commissioners and registered as aforesaid, and for no other bonds, it, the said party of the first part, will execute a deed of trust to a trust company, approved by the party of the second part, covering all of its franchises and property, both present and to be acquired, together with a subrogation of any and all rights and powers it may have under this contract. 7. That it, the party of the first part, will convey said plants when completed in accordance with this agreement, in fee simple to the party of the second part, freed and discharged from any and every encumbrance, charge or lien other than that above set forth. Second. That in consideration of the promises and covenants of the party of the first part herein set forth, the said city council

of Charleston, party of the second part, hereby covenants and agrees: 1. That it, the party of the second part, will operate said plants for the period of thirty years, or until all of the outstanding bonds above mentioned are retired, as hereinafter provided, should this occur prior to said period, keeping said plants in proper repair, and during said period shall use therefrom and supply itself therefrom and thereby with water for fire and public sanitary purposes, and with lights for the streets, alleys, public buildings and grounds of the city of Charleston, and pay therefor such annual sums as the city council of the city of Charleston shall determine in each year: Provided, that such sums shall not be less than the following, to wit: $320 per mile of water main to be laid as herein provided, with $50 extra for each public drinking fountain that the said city may require, and $75 for each of the 1,200 candle power arc lamps erected as herein provided (and in like proportion for those of greater or less candle power), and at the rate of eight cents per kilowatt for current supplied to incandescent lamps that the city shall require for lighting the public buildings or other purposes, said sums to be paid each year in two equal instalments into the hands of the city treasurer of Charleston, commissioner as hereinafter provided, as a portion of the revenue and earning constituting the sinking fund hereinafter referred to in paragraph four, next below. 2. That during said period it, the party of the second part, shall charge, require, demand and collect per annum not less than the following water rates: On unimproved property fronting on a street in which water main is laid, $3 per lot with frontage of thirty feet or less; $4 per lot if more than thirty and not more than fifty feet frontage; $5 per lot if more than fifty and not more than seventy-five feet frontage; $6 per lot if more than seventy-five and not more than 150 feet frontage; $8 per lot of more than 150 feet frontage. On improved lots on streets in which water main is laid, for each dwelling or store, including kitchen or outhouses, $3 shall be added to the above rates. These

rates shall include the use of one hot and one cold water faucet in the kitchen, or one faucet in the lavatory or yard, and the use of water for all domestic and sanitary purposes when drawn from the faucet; also the privilege of connecting with the sanitary sewer.    For other fixtures and buildings other than ordinary stores and dwellings, the following additional charges shall be made to water takers:

| | |
|---|---|
| For one water closet in dwelling (self-acting)...........$3 | 00 |
| For each water closet in dwelling, additional........... 2 | 00 |
| For one bath tub in dwelling............................. 4 | 00 |
| For two bath tubs in dwelling............................ 6 | 50 |
| For three bath tubs in dwelling......... ................. 8 | 00 |
| For each wash bowl in dwelling ......................... 1 | 00 |
| For one urinal in dwelling ................................ 1 | 50 |
| For each urinal in dwelling, additional.................. 1 | 00 |
| For one laundry sink in dwelling ........................ 4 | 00 |
| For each laundry sink in dwelling, additional......... 2 | 00 |
| For each additional kitchen or pantry sink in dwelling, 2 | 00 |
| For yard hydrant without sprinkling privileges ...... 5 | 00 |
| For yard hydrant with sprinkling privileges ...........10 | 00 |
| For wash pave............................................. 6 | 00 |
| For stable hydrant (private) for all uses, including hose.10 | 00 |
| For stable hydrant (private) for all uses, except hose. 5 | 00 |

For same fixtures in hotels and boarding houses, double the above rates whenever not arranged for the use of one bedchamber only.    For other uses, rates to be special, but upon same comparative basis as above.    To large consumers meter rates may be given from ten cents per 1,000 gallons for average consumption of 50,000 gallons per day to fifty cents per 1,000 gallons for average consumption of 1,000 gallons per day.    3. That the administrative expenses of operating the said plants during said period, to be deducted from the revenues above mentioned, shall not exceed $2,500 per annum.    4. That it, the party of the second part, shall and will apply all of the revenues and earnings derived from the operation of said plants as aforesaid, less the expense of their operation, and maintenance and repair, to a sinking

fund for the purpose of paying the interest on the aforesaid
bonds and retiring same; and for the better protection of the
party of the second part, it is agreed that the said sinking
fund shall be delivered to the city treasurer of Charleston
in trust, first, to pay therefrom the coupons on outstanding
bonds issued as aforesaid as they become due, and then to
purchase, retire and cancel such of said bonds as it is possi-
ble to obtain for not more than the equivalent of placing
the money so paid in an investment yielding $4\frac{1}{2}$ per cent.
per annum, calculating the bonds as payable fifteen years
from date of issue, and thereafter at not less than par, or in
the event of none being obtainable within said limit, to in-
vest said proceeds in State of South Carolina $4\frac{1}{2}$ per cent.
bonds or other approved public security until such time as
the said bonds may be obtainable within said limit or until
the accumulation of a sufficient fund to call in all outstand-
ing bonds, under the terms thereof; then in trust to call in
said outstanding bonds, cancelling same for the party of the
first part, and to deliver all cancelled bonds and coupons,
together with the amount necessary to pay all bonds not
cancelled, to the mortgage trustee herein referred to, return-
ing any surplus there may be to the party of the second part.
5. That the party of the second part shall not be liable under
this contract for the payment of any sum or sums other than
the special fund, to wit: the net earnings or revenues, con-
stituting the sinking fund hereinbefore provided.   Third.
It is mutually agreed that all bonds issued as aforesaid shall
be registered by the sinking fund commissioner, who shall
be the city treasurer of Charleston, as aforesaid; and it shall
be his duty to register in a proper book, kept for that pur-
pose, all bonds which may be presented to him, duly exe-
cuted by the party of the first part hereunder, and certified
to by the board of water and light commissioners, and to
affix to said bonds his certificate of registration.   It shall
be the further duty of said city treasurer as such sinking
fund commissioner to receive and collect the net revenues
above mentioned, and apply same in accordance with the

provisions of this agreement. It is further understood and agreed that for his services in this respect there shall be allowed him a compensation of $300 per annum, to be deducted by him from the said annual revenue. Fourth. It is further understood and agreed that the board of water and light commissioners hereinabove referred to shall consist of three citizens of Charleston, selected by the said city council and approved by the said party of the first part, and to hold office until the completion of the aforesaid work by the party of the first part, and of the issuance of the bonds above provided; and said commissioners shall organize as a board, with a chairman, secretary and a seal, and shall faithfully, to the best of their abilities, perform the duties herein imposed upon them. In the event of a vacancy in said board for any cause, said vacancy shall be filled by the party of the second part, with the approval of the party of the first part. Fifth. It is further understood and agreed by and between the parties hereto that the plant and franchises of the present Charleston Water Works Company may be purchased and incorporated in the system above-mentioned, in so far as may be advantageously done, at such figure, not exceeding $350,000, as may hereafter be agreed upon by the party of the second part, to wit: the city council of Charleston, payable either in cash or in bonds: Provided, same shall be concluded and arranged within fifteen days after notice shall be given by the party of the first part that the determination of this matter is desired. In witness whereof, the parties hereto have caused these presents to be executed by their proper officials, the year and day first mentioned. Chas. R. Valk, president. H. F. Bremer, secretary and treasurer. In the presence of John B. White, W. C. Bissell.

The petitioner alleges the incorporate character of each defendant—the latter having been incorporated by the legislature of this State in February, 1898; but they insist that the Charleston Water and Light Company is practically without capital, and is really designed to represent

the.city of Charleston. That the contract assailed is unlawful, because in palpable disregard of the provisions of the act of the General Assembly of this State, approved 17th December, 1881, whereby the city of Charleston was forbidden to create any new bonded debt, except by a strict compliance with the provisions of said act. That the contract is void because the city of Charleston is thereby attempting to violate the provisions of section 7 of article 8 of the State Constitution. That the contract is void because in violation of section 5 of article 8 of the State Constitution; that it is also void because violative of section 6 of article 8 and of section 5 of article 10 of the Constitution of this State. The defendants first demur to the petitions because they fail to state facts sufficient to constitute a cause of action, and in the event their demurrers are overruled, then they answer to the merits, protesting that the Charleston Water and Light Company is a corporation under the laws of the State, having for its object providing the city of Charleston and its people with pure water to drink, and for a fire department, and for sanitary purposes, all of which by their contract with said city they will furnish in larger quantities and at a cheaper rate than there is now being furnished of either; that by the system of water works they propose that fifty miles of the streets of said city will be laid with pipes, whereas at present there are only thirty miles of said streets with pipes to conduct the water; that the new system of water works will be more accessible for the purpose of putting out fires, as well as for drinking and sanitary purposes; and also that they propose to furnish 400 1,200 candle power arc lamps of electric lights for the streets and public buildings; that the only bonds to be issued are those issued by the Charleston Water and Light Company under the contract; that the city of Charleston is only liable for the sums provided in the contract for annual amounts for public water and light supply, and is not liable for the bonds issued by the company, and cannot be sued thereon; that in the event that the water and light revenues may

not be sufficient to pay interest on the bonds, the city would not be liable therefor, and that the bondholders would have the security of their mortgage on the water and light plants.

The demurrer to each of the petitions cannot be sustained, and our reasons for such conclusions will be given in the discussion of the cases on their merits.

We cannot fail to express at the outset our deep sympathy with the respondent, the city of Charleston, in its effort to secure that great blessing, pure water. We are not unmindful, as was suggested by one of respondent's council, "that Charleston occupies a stretch of low land, but little above the level of the sea, and is surrounded by malarious swamps; that the city is one of the oldest in the country, is built up largely of wooden structures, with a large population of negroes; that, the surface of the land being perfectly flat, the city is without the natural drainage afforded by a rolling country; that there are no springs or wells in the city which furnish water suitable for drinking purposes or adequate for the purposes of sanitation or fire protection * * *." It is admitted that the whole taxable property of the city of Charleston is a little more than $18,000,000, and that its bonded indebtedness is now over $3,000,000. It is admitted that the capital stock of the respondent, the Charleston Water and Light Company, is $50,000, and that it may be organized upon the subscription of $25,000, and also the payment of twenty per cent. of said $25,000, which is $5,000, and that this last mentioned sum has been paid to its duly appointed treasurer.

The first questions presented will, necessarily, be the organization and power of the respective contracting parties, the city of Charleston on the one side, and the Charleston Light and Water Company on the other side. There can be no doubt, in the light of the repeated adjudications of this Court, that the city of Charleston has been duly chartered by the legislature of this State. See act of 1783, 7th Statutes at Large, 97; *Copes* v. *City of Charleston*, 10 Rich., 491; *City Council of Charleston* v.

*Wentworth St. Baptist Church*, 4 Strob., 306; nor that it is clothed by law with plenary powers, under its charter, to maintain, preserve, and care for, by its corporate action, the wants, necessities, and proper government of all persons and property within its territorial limits. And, on the other hand, that the legislature of this State has duly chartered the respondent, the Charleston Light and Water Company. See 22 Stat. at Large, 935. The act incorporating the latter was a due exercise by the legislature of this State of the powers residing in the General Assembly of this State. It is no part of the duty of this Court to inquire into the reasons for its creation—our sole duty would be an inquiry, if the same were necessary, into the exercise of this power lodged in the General Assembly, to see if it was in conformity with the provisions of the Federal and State Constitutions, but there is no such question or questions presented to us for our determination in the cases at bar.

We are next brought to consider the agreement between these two corporations as it is embodied in the contract assailed. Before we shall pursue this investigation, it may be well for us to consider what is the sphere of duty of a municipal corporation. Without endeavoring to reproduce the varied expression of law writers on this subject, it seems to us that Chief Justice Shaw of the Supreme Court of the Commonwealth of Massachusetts, in the case of *Spaulding* v. *Lovell*, 23 Pick., 71–74, has well expressed the law on this subject, where he says: "Corporations * * * can exercise no powers but those which are conferred upon them by the act by which they are constituted, or such as are necessary to the exercise of their corporate powers, the performance of their corporate duties, and the accomplishment of the purposes of their association. This principle is fairly derived from the nature of corporations, the mode in which they are organized, and in which their affairs must be conducted. In aggregate corporations, as a general rule, the act and will of a majority is deemed in law the act and will of the whole, and, therefore, is to

be carried into effect as the act of the corporate body. The consequence is, that a minority must be bound, not only without, but against, their consent. Such an obligation may extend to every onerous duty, to pay money to an unlimited amount, to perform services, to surrender lands, and the like. It is obvious, therefore, that if this liability were to extend to unlimited and indefinite objects, the citizen, by being a member of a corporation, might be deprived of his most valuable personal rights and liberties. The security against this danger is in a steady adherence to the principle stated, that corporations can only exercise their powers over their respective members for the accomplishment of limited and defined objects." The contract between the respondents was executed on the 10th May, 1898. Is it a valid contract? We observe, in the first place, that the contracting parties occupy a very close relation the one with the other. Very great stress is laid, in the report of the committee on municipal improvements, upon the fact that the friends in the city council of a system of water works have a close hold on the Light and Water Company. Look at the facts: the committee on municipal improvements are, in a large measure, the incorporators of the Light and Water Company. They are the holders of the stock subscribed, of which twenty per cent. has been paid to the treasurer. The corporators have only paid a little more than $5,000 to the treasurer. The corporators of the Light and Water Company are to be paid one-half of one per cent. on all moneys expended in the erection of the light and water plants. The corporators are to issue $1,000,000 in bonds, the proceeds of which are to be negotiated to raise the money necessary to complete the light and water plants. This one-half of one per cent. on $1,000,000 will reimburse such corporators for the $5,000 subscribed and paid in to the capital stock of the Light and Water Company. These corporators have bound themselves to execute a deed in fee simple for the two plants—light and water works—to the city of Charleston, *as soon as said plants* are completed, re-

serving only that the holders of the $1,000,000 of light and water works bonds shall not be injuriously interfered with. The city of Charleston is to pay all the expenses of the operation of both plants. Another significant fact is that the city binds itself to operate both plants for thirty years, or until the bonds are paid. While it may not be sued on the bonds, it can be sued by the holders of these bonds and be compelled to carry out its contract to operate these water works and light plants for full thirty years. Not only so, but the city binds itself for and during these thirty years to pay to the Light and Water Company $46,000 each year for public lights and public water, and also binds itself to collect from the owners of the lots of land, both improved and unimproved, lying on each side of the fifty miles of streets where the water mains are laid, the sum of $59,000 during each year of the thirty years of the contract, or until the bonds are paid. That these are the facts, look at the exhibits made to respondent's return:

EXHIBIT "A."

City of Charleston, S. C., May 26th, 1898.   Assessor's Office.

*Improved Lots.*

| Wards. | 30 feet and under. | 30 to 50 feet. | 50 to 75 feet. | 75 to 150 feet. | 150 feet and over. | Totals. |
|---|---|---|---|---|---|---|
| 1............ | 167 | 139 | 63 | 53 | 77 | 429 |
| 2............ | 54 | 157 | 54 | 66 | 12 | 343 |
| 3............ | 369 | 199 | 68 | 46 | 32 | 714 |
| 4............ | 213 | 287 | 107 | 48 | 11 | 666 |
| 5. ......... | 192 | 302 | 78 | 59 | 11 | 642 |
| 6............ | 137 | 247 | 91 | 70 | 10 | 555 |
| 7............ | 116 | 217 | 52 | 48 | 18 | 451 |
| 8............ | 124 | 244 | 85 | 64 | 18 | 535 |
| 9............ | 126 | 322 | 25 | 33 | 9 | 515 |
| 10............ | 313 | 325 | 102 | 43 | 21 | 804 |
| 11............ | 324 | 656 | 95 | 41 | 25 | 1,141 |
| 12............ | 169 | 480 | 39 | 24 | 11 | 722 |
| Totals... | 2,304 | 3,575 | 858 | 595 | 185 | 7,517 |

*Unimproved Lots.*

| Wards. | 30 feet and under. | 30 to 50 feet. | 50 to 75 feet. | 75 to 150 feet. | 150 feet and over. | Totals. |
|---|---|---|---|---|---|---|
| 1............ | 8 | 7 | 4 | 7 | 2 | 28 |
| 2............ | 4 | 49 | 17 | 4 | 7 | 81 |
| 3............ | 21 | 5 | 2 | 2 | 1 | 31 |
| 4............ | 5 | 15 | 3 | 1 | 1 | 25 |
| 5............ | 9 | 46 | 2 | 4 | .............. | 61 |
| 6............ | 5 | 17 | 3 | 4 | 8 | 37 |
| 7............ | 2 | 1 | 2 | 1 | 3 | 9 |
| 8.......,.... | 11 | 16 | 6 | 3 | 4 | 40 |
| 9............ | .............. | 18 | ............... | 19 | 30 | 67 |
| 10............ | 118 | 176 | 49 | 65 | 31 | 439 |
| 11............ | 92 | 132 | 9 | 5 | 5 | 243 |
| 12............ | 71 | 290 | 17 | 12 | 24 | 414 |
| Totals... | 346 | 772 | 114 | 127 | 116 | 1,475 |

I certify the above to be a true copy, as shown by the ward books, of the improved and unimproved lots in the city of Charleston.

Total improved lots ............................. 7,517
Total unimproved lots........................... 1,475

Grand total....·..................... 8,992
(Signed)    D. L. SINKLER, *City Assessor.*

*Recapitulation.—Improved Lots.*

30 feet—2,304, at $6......................................... $13,824 00
50 feet—3,575, at $7......................................... 25,025 00
75 feet— 858, at $8......................................... 6,864 00
150 feet— 595, at $9............. ....................·...... 5,355 00
Over— 185, at $11....................................... 2,035 00

7,517............................................... $53,103 00

*Unimproved Lots.*

30 feet—346, at $3....................................... $1,038 00
50 feet—772, at $4....................................... 3,088 00
75 feet—114, at $5....................................... 570 00
150 feet—127, at $6....................................... 762 00
Over 150 feet—116, at $8....................................... 928 00

1,475 ................................. $6,386 00

Total of improved and unimproved..................... $59,489 00
Cost of water works for public use...................... 16,000 00
Cost of 400 arc lights for public use..................... 30,000 00

Grand total......................................$105,439 00

Consider, also, that the interest on the $1,000,000 at five per cent is $50,000; that the city obligates itself to deduct from the $105,439 each year the sum of $2,500 as operating expenses, $300 to be paid therefrom to the city treasurer for his services. When this $52,000 is deducted from the $105,439, there will be left in the hands of the city treasurer each year, for payment of the bonds, $53,361. By the judicious management of this sum of $53,561 each year, as contemplated by the contract, it is believed that in fifteen years the whole $1,000,000 of bonds issued by the Light and Water Company will be fully paid. And when this is done, the city of Charleston will own in fee simple, free from all debts therefor, the light and water plants in question. In the year 1881, the city of Charleston, presumably to obtain a reduction in the amount of interest upon her funded bonded indebtedness, procured the General Assembly of this State to pass the act found on page 582 of vol. 17 of Stat. at Large, whose title is "An act to prevent the city council of Charleston from increasing the debt of the city of Charleston, except in the manner herein prescribed." By the provisions of this act, the city council of Charleston was forbidden to create any debt beyond the municipal income of the current year, or to indorse or guarantee the notes, bonds or obligations, or to accept the drafts of any company, corporation, person or persons for any purpose whatsoever, unless these terms and conditions were first observed and complied with: *First.* The city council shall by resolution declare its intention to create such indebtedness, specifying the amount thereof—such resolution to be passed at a regular meeting by a two-thirds vote of the whole body. *Second.* That such action by the city council shall be submitted to the qualified voters of such city at an election to be held after ninety days notice of such election, and if two-thirds of the number of qualified voters who voted at the preceding municipal election vote affirmatively, the proposition shall then be submitted to the General Assembly of this State for approval, and upon such approval

18—53

the city council shall be authorized to create the debt or incur the liability. The petitioners claim that the contract of May 10th, 1898, violates the provisions of this act. Respondents allege, however, that the present contract for lighting the city and furnishing water for public purposes is in excess of the $46,000 which the city council, under the proposed contract, will expend for these purposes. It should be remembered that this $46,000 is to be raised by taxation from the citizens of the municipality. But where does the $59,439 come from? Is it not collected from the citizens of Charleston by means of the action of the city council? And in wringing this money every year for thirty years, it may be, which wringing process the city council solemnly covenants with the Light and Water Company (and through the same with the holders of the proposed issue of $1,000,000 of bonds, whose interest at five per cent. is payable in two instalments each year) shall be continued every year for thirty years, or until the bonds are fully paid. It is true, the bonds are not signed by the city council, but they are registered by its treasurer and approved by its committee; but is it not true that it is by the city council's action that this enormous burden is placed upon the backs of the holders of these 8,992 lots of land, improved and unimproved, while all the other holders of lots of land, improved and unimproved, lying on the thirteen miles of the streets of the city of Charleston, whereon no water mains are laid, together with the owners of personal property, are left untouched? Suppose there are 8,992 citizens who own these 8,992 lots of land, what reason can be assigned why these land owners should bear the burden of the other 53,000 citizens of Charleston? Is it because the provisions of the act of the legislature of 1881 are not infringed? We can sustain no such proposition.

It is contended, however, by the petitioners that it is not alone the act of 1881 which the city council has disregarded, but that its contract is in violation of the provisions of the State Constitution in several particulars. Let us state these

constitutional provisions: Art. I., "Sec. 5. * * * Nor shall any person be deprived of life, liberty or property without due process of law, nor shall any person be denied the equal protection of the laws." Art. I., "Sec. 6. All property subject to taxation shall be taxed in proportion to its value." Art. I., "Sec. 17. * * * Private property shall not be taken for private use without the consent of the owner, nor for public use without just compensation being first made therefor." Art. II., "Sec. 13. In authorizing a special election in any incorporated city or town in this State for the purpose of bonding the same, the General Assembly shall prescribe as a condition precedent to the holding of said election a petition from a majority of the freeholders of said city or town as shown by its tax books, and at such election all electors of such city or town * * * shall be allowed to vote; and the vote of a majority of those voting in said election shall be necessary to authorize the issue of said bonds." Art. III., "Sec. 29. All taxes upon property, real and personal, shall be laid upon the actual value of the property taxed, as the same shall be ascertained by an assessment made for the purpose of laying such tax." Art. VIII., "Sec. 3. The General Assembly shall restrict the power of cities and towns to levy taxes and assessments, to borrow money and to contract debts, and no tax or assessment shall be levied or debt contracted except in pursuance of law, for public purposes specified by law." Art. VIII., "Sec. 5. Cities or towns may acquire by construction or purchase, and may operate, water works systems and plants for furnishing lights, and may furnish water and lights to individuals, firms, and private corporations for reasonable compensation: *Provided*, That no such construction or purchase shall be made except upon a majority vote of the electors in said cities or towns who are qualified to vote on the bonded indebtedness of said cities or towns." Art. VIII., "Sec. 6. The corporate authorities of cities and towns in this State shall be vested with the power to assess and collect taxes for corporate purposes, said taxes to be uniform in respect to persons and property within the

jurisdiction of the body composing the same; and all the property, except such as is exempt by law, within the limits of cities and towns shall be taxed for the payment of debts contracted under authority of law.    License or privileged taxes imposed shall be graduated so as to secure a just imposition of such tax upon the classes subject thereto." Art. VIII., "Sec. 7. No city or town shall hereafter incur any bonded debt which, including existing bonded indebtedness, shall exceed eight per centum of the assessed value of the taxable property therein, and no such debt shall be created without submitting the question as to the creation thereof to the qualified electors of such city or town, as provided in this Constitution for such special elections; and unless a majority of such electors voting on the question shall be in favor of creating such further bonded debt, none shall be created: *Provided,* That this section shall not be construed to prevent the issuing of certificates of indebtedness in anticipation of the collection of taxes for amounts actually contained or to be contained in the taxes for the year when such certificates are issued and payable out of such taxes: *And provided, further,* That such cities and towns shall on the issuing of such bonds create a sinking fund for the redemption thereof at maturity." Art. X., "Sec. 5. The corporate authorities of counties, townships, school districts, cities, towns, and villages may be vested with the power to assess and collect taxes for corporate purposes; such taxes to be uniform in respect to persons and property within the jurisdiction of the body imposing the same * * *."

It is proper, before going further, that we should state that the citation in this opinion of art. II., sec. 13, relating as it does to the restriction of the legislature in taking private property for private or public use, and also art. VIII., sec. 7, relating to the limit to bonded indebtedness, cannot affect the questions here involved, for confessedly the city of Charleston has long since reached her constitutional limit as to bonded indebtedness.    The remaining citations of such constitutional provisions are made in the language of the

Constitution, and practically show: 1. That taxation of persons and property must be uniform, and based upon an assessment of property already made. 2. That taxes must be laid upon all the property within the territory of municipal corporations according to its value. 3. That taxes can only be levied by municipal corporations for public or corporate purposes. 4. That methods for increasing the public debt of municipal corporations are prescribed. 5. That a method is laid down by which municipal corporations may acquire, by purchase or construction, water and light plants.

The police power is invoked to justify the action of the city council of Charleston in laying the burden of payment for the water mains upon the owners of lots which are on each side of the fifty miles of the streets of said city wherein the said water mains are laid. The declared purpose of said water mains is to furnish pure water, taken from the Edisto River, for drinking purposes for the whole city, and also the public purposes of furnishing an abundant supply of water to be used by the fire department of the city and for the flushing of the public sewers of said city for sanitary purposes. Then, also, the water so furnished is to be used by the said owners of lots both for drinking purposes and for flushing the pipes on the lots of said private persons, which pipes are allowed to be connected with the public sewers of the city. This proposition demands an examination of the police power. What is it? If, in our efforts to answer this question, we turn to the utterances of Judges and text-writers on this subject, we are met by a disclaimer on their part of an ability to lay down any exact definition of the police power. The most that such writers do is to indicate the direction it takes, and some restrictions as to its exercise. For instance, Chief Justice Taney of the United States Supreme Court, in the License Cases, 5, Howard, 583, says: "But what are the police powers of a State? They are nothing more or less than the powers of government inherent in every sovereignty to the

extent of its dominions." Then Chief Justice Shaw of the Massachusetts Supreme Court, in *Commonwealth* v. *Alger,* 7 Cush., 53, says: "The power we allude to is rather the police power—the power vested in the legislature by the Constitution to make, ordain, and establish all manner of wholesome and reasonable laws, statutes and ordinances, either with penalties or without, *not repugnant to the Constitution,* as they shall judge to be for the good and welfare of the commonwealth, and of the subjects of the same. It is much easier to perceive and realize the existence and sources of this power than to mark its boundaries, or prescribe limits to its exercise." So, also, Chief Justice Redfield, in *Thorpe* v. *Rutland,* 27 Vt., 140, says: "This police power of the State extends to the protection of the lives, limbs, health, comfort and quiet of all persons and the protection of all property within the State. According to the maxim, *Sic utere tuo ut alienum non laedas,* which being of universal application, it must, of course, be within the range of legislative action to define the mode and manner in which every one may so use his own as not to injure others." Mr. Cooly, in his work on Constitutional Limitations (sixth edition), at page 704, says: "The police of a State, in a comprehensive sense, embraces its whole system of internal regulation, by which the State seeks not only to preserve the public order, and to prevent offenses against the State, but also to establish for the intercourse of citizens with citizens those rules of good manners and good neighborhood which are calculated to prevent a conflict of rights, and to insure to each the uninterrupted enjoyment of his own, so far as it is reasonably consistent with a like enjoyment of rights by others." And the same author, at page 710, says: "The maxim, *Sic utere tuo ut alienum non laedas,* is that which lies at the foundation of the power * * *." Mr. Dillon, in his work on Municipal Corporations, at page 210, of vol. 1 (second edition), says: "Laws and ordinances relating to the comfort, health, convenience, good order, and general welfare of the inhabitants are com-

prehensively styled, 'police laws or regulations.' * * * These regulations rest upon the maxim, *Salus populi suprema est lex.* This power to restrain a private injurious use of property is very different from the right of eminent domain. It is not a taking of private property for public, use, but a salutary restraint of a noxious use by the owner, contrary to the maxim, *Sic utere tuo ut alienum non laedas.*" Mr. Black, in his work on Intoxicating Liquors, section 24, says: "It cannot be doubted, however, that the origin of this power must be sought in the very purpose and framework of organized society. It is fundamental and essential to government. It is a necessary and inherent attribute of sovereignty. It antedates all laws, and may be described as the assumption on which constitutions rest; for the State, whether we regard it as an association of individuals or as a moral organism, must have the right of self-protection and the power to preserve its own existence in safety and prosperity, else it could neither fill the law of its being nor discharge its duties to the individual. And to this end it is necessarily invested with power to enact such measures as are adapted to secure its own authority and peace, and preserve its constituent members in health, safety and morality * * *." In *Stone* v. *Mississippi*, 101 U. S., 814, the Supreme Court of the United States declined to define the power, adopting views of Chief Justice Shaw, in *Commonwealth* v. *Alger*, *supra.* Our own Supreme Court, in *Werner* v. *City Council*, 38 S. C., 488, has quoted with approval this language of the Supreme Court of the United States. And in *McCandless* v. *R. R.*, 38 S. C., 103, this Court adopted the action of the Supreme Court of the United States in the three cases cited in the 115 U. S. Reports, where the police power was under discussion, confining its operation to the three subjects of the public health, the public morals, and the public safety. The care taken in this opinion to reproduce those judicial opinions and observations of text-writers in discussing this police power, has been induced by a desire to intelligibly discuss this subject, being well aware of the divergence of

views in making application of the police power in the many cases reported in the books of decisions, which it is believed has arisen from an incorrect apprehension of the police power. It can be correctly stated, and it should be done, but it is only possible to do so by reaching the basic principle upon which the police power rests. May not the following observations tend to show this principle as recognized in this State? When the people who live within the territorial limits of the State formed the Constitution under which they now live, such provisions as would preserve the lives, liberties, and property of the people of the State were inserted. Among these provisions was that in section 5 of article 1: "1. * * * nor shall any person be deprived of life, liberty or property without due process of law. * * *" A similar provision was in the Constitution of 1790 as well as that adopted in 1868. All legislative power was vested in the House of Representatives and Senate, except such as was denied by the Federal and State Constitutions. Among the powers of legislation are recognized that of providing for the police power. This police power, belonging, as it does, to the legislature of the State, must be understood as requiring that its exercise shall be in subordination to the provisions of the Constitution. To hold otherwise would involve the exercise by a governmental agency, created by the Constitution, of power beyond that Constitution. But the decisions of the courts of last resort in this State have not left this matter in doubt. Chief Justice McIver, in *State* v. *Berlin*, 21 S. C., 296, declared that its exercise by the legislature was in subordination to the State Constitution. It was so declared in *McCandless* v. *R. R. Co., supra.* So in Massachusetts, Chief Justice Shaw, in *Commonwealth* v. *Alger, supra,* so declared. And this doctrine has been held by the Supreme Court of the United States. And Mr. Cooley, in his work on Constitutional Limitations, has so held. This police power must be exercised by the legislature, therefore, in subordination to the provisions of our State Constitution. The police power operates upon per-

sons and property within the State, hence care must always be taken to provide in such police regulations that there shall be no invasion of life, liberty or property *without due process of law.* What is the meaning that is affixed to the term, "without due process of law?" Happily, this meaning is settled in the cases of *Zylstra*, 1 Bay, 384; *White* 'v. *Kendrick*, 1 Brev., 471; *State* v. *Maxcy*, 1 McM., 502; *State* v. *Simons*, 2 Speer, 644; 5 Rich., 175; 2 Bailey, 677; 10 Rich., 440. Chief Justice O'Neall, in *State* v. *Simons, supra*, said: "There can be no hesitation in saying that these words mean the common law and the statute law existing in this State at the adoption of our Constitution. Altogether, they constitute the body of the law, prescribing the course of justice to which a free man is to be considered amenable in all times to come." A little reflection will suggest that this is true. How do the courts deprive a man of life for the crimes of murder and rape, for example? There is no provision in the Constitution demanding that murder and rape shall be so punished. Nor has the legislature, since the Constitution was adopted, so declared by legislative enactment, and yet such is the law with us. So, too, in all other crimes and misdemeanors—they are not mentioned or defined in the Constitution, yet they are punished by imprisonment in many cases. Thus both life and liberty are interfered with; these laws look to the public safety. So, also, as to property. We find no specific direction in the Constitution that a man shall so use his own that his neighbors may not be injured thereby, and yet it may be noticed that a man is required to fill up a low lot, so that the health of the neighborhood may not be injured. Also, that one cannot sell liquors without a license, and yet he is not so allowed to do. Nor can he run a gambling den. Nor can he buy or sell seed cotton in the night time. None of these matters are provided in the Constitution. How are they dealt with legally? Is it not under the constitutional provision vesting the legislature with the police power, and having it exercised under the "due process of the law?" It

is true, the police power operates on persons and property, but it is not confined in its operation to requiring persons to so use their own as not to injure the rights of others. A man may be required under the police power to surrender his property, in the management of which by himself there is no fault; for instance, if a man's land is needed to lay pipes to conduct pure water to a public fountain, it is perfectly legitimate to so appropriate it. Other illustrations might be multiplied. So, too, the money with which to pay for those things essential to public health, public morals or public safety, must be raised. This is done by taxation, being for a public purpose. Great pains are taken by some writers, in discussing the police power, to state that it is not the taxing power—it is not the right of eminent domain. This is admitted. But under what principle of law can you justify taking private lands of an individual, for the laying of water pipes through it, except the law of eminent domain? And, also, how will you justify a special tax to raise the money to pay for some public work connected with the public health, except upon the power of taxation? Then, is it not evident that while the police power is not the taxing power, nor the right of eminent domain, that in its exercise under regulations prescribed by the law-making department of the government, both of them may be used? With deference, we submit that this seems the embodied meaning in the words, "police power"—that attribute of sovereignty in a State, by which it clothes the legislature with power to regulate persons—natural and artificial—and property, in accordance with the provisions of the State Constitution, in all matters relating to the public health, the public morals, and the public safety. The legislature may delegate the power to such municipal corporations within the State limits.

Having defined the police power, and it being admitted that the supplying the city of Charleston was a public purpose (for it is twice so declared in the act of the legislature chartering the Charleston Light and Water

Company), we are now prepared to pass upon the constitutional questions raised by the petitioners. Is the burden to be placed on the property of the petitioners, in the manner provided for in the contract, to be considered as taxation? The property of these land owners, abutting on the streets through which the water mains are to be laid, is proposed to be assessed under the contract in question, certainly, uniformly, generally, but not in accordance with its value, and for a public purpose, and, also, notwithstanding such declaration by the legislature of this public purpose, inasmuch as this is to result in a benefit to the land owners whose lands abut on the streets, therefore it is legitimate for the city council to place this arbitrary tax or assessment, call it what you please, upon such property owners. It is admitted (and we might almost say, with sorrow), that some States have recognized this method of laying taxes, for that it is taxation, hear what Mr. Cooly, in his work on Taxation, at page 623, says on this subject: "That these assessments are an exercise of the taxing power has over and over again been affirmed, until the controversion must be regarded as closed;" citing twenty cases in support of this declaration. The friends of these special assessment taxes bottom their adhesion to such an illogical distinction in the matter of taxation on the special benefits accruing to these lot owners by reason of such an improvement of the property affected. The Courts of this State have repudiated any such doctrine. *The State ex rel Horlbeck* v. *City Council,* 12 Rich., 702; *Mauldin* v. *City Council of Greenville,* 42 S. C., at page 303; and we uphold those decisions on this point. But apart from these decisions, look at the facts that underlie this contention. Here is a city with some 62,000 inhabitants. Of them 8,900 are land or lot owners. Here is a city of sixty-two miles of streets, with only fifty of such miles of streets where the water mains are laid and where alone the land owners are assessed. Leaving the land owners of thirteen miles of the streets unassessed, although they can use the water for drinking

purposes, and the fire department is supplied thereby with water to extinguish any fires which may originate on their property, or be communicated thereto. The whole real estate of the city in round numbers is valued at $12,000,000, and the personal property in said city at $6,000,000, in round numbers, and yet, with these facts staring one in the face, it is proposed to tax the owners of five-sixths of the real estate in the city to furnish lights and water for all the other real estate owners, as well as the owners of one-third of the whole taxable property of the city (the personal property) and the latter to pay no part of such taxes. To say that such a system of special assessment is taxation under the Constitution, which requires that taxation shall be upon the assessment of property according to its value—that is, uniform—that such taxes shall be laid upon all the property, real and personal, except such as is especially exempted from taxation by the Constitution itself—that is, general— is to lay down a proposition unsupported by reason or authority. It may be admitted that in those States where the benefit rule obtains in the matter of special assessments, the proposition advanced might receive some color of support. Such a doctrine is repudiated in this State both by our Constitution builders and our Courts in giving effect to its salutary safeguards—this assessment being made in violation of the limitations imposed upon the General Assembly in clothing municipal corporations with the right to tax persons and property within their territorial limits, must be asserted. Again, we are inclined to hold that inasmuch as the Constitution of this State contains a method to be adopted by municipal corporations within this State for acquiring a system of water works and a light plant, either by construction or purchase, every municipal corporation must adjust itself to that plan, upon the theory that when the Constitution has pointed out the method to obtain these things, it excludes any other method. We are not insensible to the fact that there is a tendency everywhere apparent to check the contraction of debt by State agencies, such as

townships, cities, and towns; and when the Constitution of our State, adopted at the close of the year 1895, contains provision well calculated to check this danger, we will be mindful of the lesson intended to be inculcated.

It is, therefore, the judgment of this Court, that the writ of injunction, as prayed for by each of the petitioners, do issue from this Court, directed to each of the respondents, restraining them perpetually from issuing the bonds in question, or in any other manner carrying out the contract between the city council of Charleston and the Charleston Light and Water Company touching the said light plant and water works for the city of Charleston, under the contract of 10th May, 1898.

MR. JUSTICE JONES *dissents.*