# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT
_____

No. 06-2406
_____

Hawkeye Commodity Promotions, Inc., &ast;
&ast;
&ast;
        Plaintiff – Appellant, &ast;
&ast;
  v. &ast;
&ast;
Thomas J. Vilsack, in his &ast;
official capacity as Governor of &ast;
the State of Iowa, &ast;
&ast;
        Defendant, &ast;
&ast;
Thomas J. Miller, in his official &ast;   Appeal from the United States
capacity as the Attorney General &ast;   District Court for the Northern
of the State of Iowa; Kevin W. &ast;   District of Iowa.
Techau, in his official capacity &ast;
as the Commissioner of the Iowa &ast;
Department of Public Safety, &ast;
&ast;
        Defendants – Appellees, &ast;
&ast;
Iowa Lottery Authority; &ast;
Edward Stanek, Dr., in his &ast;
official capacity as the Chief &ast;
Executive Officer of the Iowa &ast;
Lottery Authority, &ast;
&ast;
        Defendants. &ast;

Submitted: December 11, 2006
Filed: April 24, 2007

_____

Before BYE, COLLOTON, and BENTON, Circuit Judges.

_____

BENTON, Circuit Judge.

In March 2006, Iowa enacted legislation ending the TouchPlay lottery game. Hawkeye Commodity Promotions, Inc., a licensed TouchPlay retailer, tried to enjoin the law before it took effect. Hawkeye argued that the law violates the Contracts, Takings, Equal Protection, and Due Process clauses of the federal constitution. The district court[1] rejects these claims. *See Hawkeye Commodity Promotions, Inc., v. Miller*, 432 F.Supp.2d 822 (N.D. Iowa 2006). Hawkeye appeals, reiterating those claims and asserting that the district court should have admitted the deposition testimony of the president of the Iowa Lottery Authority (the Lottery). This court affirms.

I.

Following revenue shortfalls in 2000 and 2001, the Iowa General Assembly authorized the Lottery to "establish a plan to implement the deployment of pull-tab vending machines with video monitors." The Lottery then added the TouchPlay game. A TouchPlay machine is "a vending machine that dispenses or prints and dispenses lottery tickets that have been determined to be winning or losing tickets by a predetermined pool drawing machine prior to the dispensing of the tickets." **IOWA**

_____

[1] The Honorable Linda R. Reade, Chief Judge, United States District Court for the Northern District of Iowa.

**ADMIN. CODE r. 531-14.3**.  With flashing lights and captivating sounds, TouchPlay machines resemble slot machines.  Unlike slot machines, which are random, TouchPlay is not random.  Tickets are loaded into the machine electronically, and like pull-tab tickets, the outcome of each game is predetermined.

The Lottery never owned any TouchPlay machines.  They were manufactured and distributed to retailers, who purchased or leased them.  The Lottery contracted for the manufacture of TouchPlay machines; licensed the retailers to put them in businesses; set the number of winning tickets and the amount paid out on each machine; collected data from the machines; and split the revenue with manufacturers and retailers.  TouchPlay began with 30 machines in May 2003, expanding rapidly: By April 2006, more than 6,400 machines operated at 3,800 businesses across Iowa.

Hawkeye was incorporated and capitalized solely as an Iowa TouchPlay retailer.  On January 3, 2005, Hawkeye applied for an MVM (monitor vending machines) retailer license, which was issued on January 10.  Accompanying the license were:  a letter including a five-year revenue-sharing formula; door decals for Hawkeye's machines; and, a memo entitled "Licensing Terms and Conditions (January 2005)," summarizing the applicable laws and regulations.  Hawkeye owns 724 TouchPlay machines, 581 of which operated at 187 Iowa businesses in April 2006.  Hawkeye invested about $6.8 million in this venture – $4.7 million to buy the machines, and $2.1 million in start-up and operational costs.

Responding to concerns about the "proliferation of gambling," in January 2006 Governor Thomas J. Vilsack ordered a 60-day moratorium on new TouchPlay licenses while a task force studied it.  In March the task force recommended restrictions to protect gambling addicts and minors.  Governor Vilsack extended the moratorium "to give the Iowa Legislature time to act on the matter if it so chooses."  The General Assembly passed legislation banning TouchPlay, which the Governor signed March 20 (to be codified at Iowa Code § 99G.30A(4)).  The ban took effect May 4.

On April 5, Hawkeye sued for declaratory and injunctive relief, invoking the Contracts, Takings, Equal Protection, and Due Process clauses of the United States Constitution. An expedited trial occurred April 12, with testimony by affidavit. Hawkeye later moved to re-open the record to add the deposition of Dr. Edward J. Stanek, president of the Lottery. On April 26, the district court denied the motion and issued a decision. This court reviews the district court's factual findings for clear error, and its legal and constitutional conclusions de novo. *Daggitt v. United Food & Commercial Workers Int'l Union, Local 304A*, 245 F.3d 981, 986 (8th Cir. 2001).

## II.

No state shall pass any law "impairing the Obligation of Contracts." **U.S. CONST. art. I, § 10, cl. 1**. Hawkeye's main argument is that SF 2330 (the bill number of the TouchPlay law) "completely destroyed" Hawkeye's contracts with the Lottery, and with over 200 Iowa businesses.

Much of Hawkeye's discussion addresses its license. Hawkeye emphasizes at length that its license could not be terminated without good cause, 60 days' notice, and a hearing. **IOWA ADMIN. CODE r. 531-14.1 to -14.20**. But Hawkeye's license has not been terminated; Hawkeye still has its license. The Licensing Terms and Conditions, which Hawkeye agreed to in its application, state: "If a provision in this document conflicts with an applicable statutory or regulatory provision, the statutory or regulatory provision preempts the conflicting provision in this document." The abolition of TouchPlay did not trigger the administrative rules governing Hawkeye's license.

-4-

A.

A three-part test determines whether a statute violates the Contracts Clause. "The first question is whether the state law has, in fact, operated as a substantial impairment on pre-existing contractual relationships." ***Equip. Mfrs. Inst. v. Janklow***, 300 F.3d 842, 850 (8th Cir. 2002). This question "has three components: whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial." ***Gen. Motors Corp. v. Romein***, 503 U.S. 181, 186 (1992).

i.

The parties appear to assume that the existence of a contract is governed by state law. Indeed, the district court looks only to Iowa law, finding an implied-in-fact unilateral contract of indefinite duration, which either party could cancel at any time. *See* ***Hawkeye***, 432 F.Supp.2d at 843-46. But "whether a contract was made is a federal question for purposes of Contract Clause analysis." ***Romein***, 503 U.S. at 187 (citing ***Irving Trust Co. v. Day***, 314 U.S. 556, 561 (1942)).

In *Stone v. Mississippi*, 101 U.S. 814 (1880), the Supreme Court rejected a private company's Contracts Clause challenge to the state's cancellation of its lottery charter.

> Any one, therefore, who accepts a lottery charter does so with the implied understanding that the people, in their sovereign capacity, and through their properly constituted agencies, may resume it at any time when the public good shall require, whether it be paid for or not. All that one can get by such a charter is a suspension of certain governmental rights in his favor, subject to withdrawal at will. He has in legal effect nothing more than a license to enjoy the privilege on the terms named for the specified time, unless it be sooner abrogated by the sovereign power

-5-

of the State. It is a permit, good as against existing laws, but subject to further legislative and constitutional control or withdrawal.

*Id.* at 821. In *Douglas v. Kentucky*, 168 U.S. 488, 502 (1897), the Supreme Court said flatly, "a lottery grant is not, in any sense, a contract within the meaning of the Constitution of the United States, but is simply a gratuity and license, which the State, under its police powers, and for the protection of the public morals, may at any time revoke, and forbid the further conduct of the lottery."

This court is "bound to decide for ourselves whether a contract was made, what are its terms and conditions, and whether the state has, by later legislation, impaired its obligation. This involves an appraisal of the statutes of the states and the decisions of its highest courts." ***Ind. ex rel. Anderson v. Brand***, 303 U.S. 95, 100 (1938). In *Romein*, 503 U.S. at 187, the Supreme Court adopted the state supreme court's holding that workers' compensation benefits were not an implied term of a contract. Looking to Indiana law, the Court in *Brand*, 303 U.S. at 104, concluded, "the petitioner had a valid contract with the respondent."

*Stone* and *Douglas* are clear: A lottery "grant" or "charter" is not protected by the Contracts Clause. Hawkeye responds that *Stone* and *Douglas*, while "certainly good law," involve "an entirely different circumstance." On the contrary, *Stone* and *Douglas* are not distinguishable: in both cases, the legislature allowed a private party to operate a lottery, which was later nullified (in *Stone*, by the state's Reconstruction constitution; in *Douglas*, by act of the legislature and then by amendment to the state constitution). That fairly describes the history of TouchPlay in Iowa. Whatever agreement existed between Hawkeye and the Lottery is not protected by the Contracts Clause of the federal constitution.

ii.

As to the location contracts, it is undisputed on appeal – and this court decides – that they are contracts within the Contracts Clause, and are impaired by SF 2330.

This court therefore asks whether the impairment of Hawkeye's contracts – with its locations and with the Lottery (assuming the district court is correct that they are protected by the Contracts Clause) – is substantial.

iii.

Substantial impairment depends on "the extent to which the [parties'] reasonable contract expectations have been disrupted. Reasonable expectations are affected by the regulated nature of an industry in which a party is contracting." *In re: Workers' Comp. Refund Western Nat'l Mut. Ins. Co.*, 46 F.3d 813, 819 (8th Cir. 1995) (citations omitted). "In determining the extent of the impairment, we are to determine whether the industry the complaining party has entered has been regulated in the past." *Energy Reserves Group v. Kan. Power & Light Co.*, 459 U.S. 400, 411 (1983).

Like Hawkeye, the public utility in *Energy Reserves* was "operating in a heavily regulated industry. State authority to regulate natural gas prices is well established." *Id.* at 414 (citations omitted). State authority to regulate gambling is similarly well-established: "No one would question that [the State] has the power to regulate gambling in the interest of the public health, safety, and general welfare." *Neb. Messenger Servs. Ass'n v. Thone*, 611 F.2d 250, 251-52 (8th Cir. 1979) (quoting the district court to uphold a Nebraska statute prohibiting service fees on pari-mutuel betting against federal constitutional challenges).

In this case, the contracts themselves demonstrate Hawkeye's diminished contract expectations. The location contracts provide:

> In consideration of the sum of $10.00, Proprietor hereby grants unto HCP [Hawkeye] the exclusive right for five (5) years to install and maintain all Monitor Vending Machines, Lottery Touchplay, and lottery vending machines *as may be allowed by law or promulgated regulation* . . ..

-7-

(emphasis added).  In regard to any agreement with the Lottery, the Licensing Terms and Conditions memorandum that Hawkeye agreed to in January 2005 state at the top of the first page:

> The provisions of Iowa Code chapter 99G, 531 Iowa Administrative Code, and any other applicable statutory or regulatory provisions are herein incorporated by reference.  If a provision in this document conflicts with an applicable statutory or regulatory provision, the statutory or regulatory provisions preempts the conflicting provision in this document.

Likewise, the contracts in *Energy Reserves* "expressly recognize the existence of extensive regulation by providing that any contractual terms are subject to relevant present and future state and federal law." *Id.* at 416.  This court holds that, like the plaintiff in *Energy Reserves*, Hawkeye's "reasonable expectations have not been impaired." *Id.*  SF 2330 does not substantially impair any Lottery or location contracts.  Hawkeye's Contracts Clause argument fails on the first prong of *Janklow*.

B.

Alternatively, assuming a substantial impairment, the second and third prongs of the Contracts Clause analysis come into play.  The second prong of the three-part test is whether the state has a "significant and legitimate public purpose behind the regulation." *Janklow*, 300 F.3d at 850.  If, as Hawkeye claims, "the State offers no significant and legitimate public purpose for abolishing TouchPlay while continuing all other lottery games," then SF 2330 is unconstitutional under the Contract Clause.  The state has the burden to show this purpose. *Id.* at 859-60.

The state identifies the need "to curb the expansion of gambling" as the purpose of SF 2330.  Gambling is illegal in Iowa. **IOWA CODE § 725.7**.  Gambling in Iowa is permissible only if authorized by a specific statutory exception. *See, e.g.*, **IOWA CODE §§ 725.14, .15** (ban on gambling does not apply to pari-mutuel betting

regulated by the state racing and gaming commission, or to state lottery games regulated by the Iowa Lottery Authority). Existing at the sufferance of the Legislature, gambling is a heavily regulated industry in Iowa. *See* **IOWA CODE §§ 99G.1-.42**; **IOWA ADMIN. CODE r. 531-1.1 to -20.23**. The regulation of gambling – including its expansion and contraction – is a significant and legitimate public purpose for SF 2330.

The third prong is "whether the adjustment of the 'rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption.'" *Janklow*, 300 F.3d at 850 (alteration in original). This court finds that it is. TouchPlay began with 30 machines in bars and fraternal clubs in May 2003. Within three years, more than 6,400 machines functioned in nearly 3,000 Iowa business of all sorts, including grocery stores, restaurants, gas stations, truck stops, convenience stores, bowling alleys, and laundromats. As TouchPlay expanded, the public became concerned about protecting minors and compulsive gamblers. A state's police power encompasses controlling gambling, even to the point of abolishing a particular lottery game. *See, e.g.*, *Stone*, 101 U.S. at 818 (the police power "extends to all matters affecting the public health or the public morals. Neither can it be denied that lotteries are proper subjects for the exercise of this power.") (citations omitted); *Douglas*, 168 U.S. at 502; *Neb. Messenger*, 611 F.2d at 251-52.

Iowa's abolition of TouchPlay does not violate the Contracts Clause.

### III.

Private property shall not "be taken for public use, without just compensation." **U.S. CONST. amend. V**. Hawkeye considers SF 2330 a legislative taking of its property (i.e., the TouchPlay machines, its overall "business," the Lottery contract, and the location contracts).

A.

First, Hawkeye must show property interests protected by the Takings Clause. *See **Ruckelshaus v. Monsanto Co.***, 467 U.S. 986, 1001-03 (1984). *See also **Tex. State Bank v. United States***, 423 F.3d 1370, 1378 (Fed. Cir. 2005) ("'bedrock requirement' of any successful takings challenge" is that the "plaintiffs must identify a property interest cognizable under the Fifth Amendment.") The Constitution "protects rather than creates property interests." ***Phillips v. Wash. Legal Found.***, 524 U.S. 156, 164 (1998). This court therefore looks to Iowa law to evaluate Hawkeye's property interests. *See **Bd. of Regents of State Colls. v. Roth***, 408 U.S. 564, 577 (1972) ("the existence of a property interest is determined by reference to 'existing rules or understandings that stem from an independent source such as state law.'").

No doubt the machines are property under the Takings Clause. Hawkeye also claims a property interest in its TouchPlay business, and continued operation of its enterprise. The district court finds (and the state does not dispute) that Hawkeye "has some property interest" in the business itself. ***Hawkeye***, 432 F.Supp.2d at 852 (citing ***Kimball Laundry Co. v. United States***, 338 U.S. 1, 5 (1949) (Takings Clause protects "intangible" business assets like trade routes, goodwill, and earning power)).

As to the continued operation of the business, Hawkeye's participation in TouchPlay required an MVM license. "The possession of an MVM license . . . is a privilege personal to that person or entity and is not a legal right." IOWA ADMIN. CODE r. 531-14.12. As the district court explains, because Hawkeye's MVM license cannot be sold, assigned, or transferred, it "lacks the indicia of a property interest." *See* IOWA ADMIN CODE r. 531-14.6 ("MVM licenses may not be transferred to any other person or entity . . ..."). *See generally **Cent. States Theatre Corp. v. Sar***, 66 N.W.2d 450, 455 (Iowa 1954) ("when a business is inherently illegal [e.g., liquor, tobacco] a permit to operate may be granted or refused at the will of the licensing body, is a privilege rather than a property right") (bracketed text added); ***Smith v. Iowa Liquor Control Comm'n***, 169 N.W.2d 803, 807 (Iowa 1969) (upholding the

revocation of a liquor license because "a license to sell beer, is a privilege granted by the state and is in no sense a property right."); *Alfredo v. Iowa Racing & Gaming Comm'n*, 555 N.W.2d 827, 832 n.2 (Iowa 1996) (dicta, property rights in a gambling license may exist only when statute expressly identifies the license as a right, as opposed to a privilege).  *Cf. Cleveland v. United States*, 531 U.S. 12 (2000) (state video-poker license is not property under the federal mail fraud statute, 18 U.S.C. § 1341).  Hawkeye does not have a property right in the continuation of its TouchPlay business for Takings Clause purposes.

As to Hawkeye's property-in-contracts argument, the district court holds that because the location contracts "allow for termination of the contract due to a change in law or regulation," they "do not constitute a property interest for the purposes of the takings clause."   *Hawkeye*, 432 F.Supp.2d at 854.  The January 2005 Licensing Terms and Conditions say, "If a provision in this document conflicts with an applicable statutory or regulatory provision, the statutory or regulatory provisions preempts the conflicting provision in this document."  Contract rights are "a form of private property" in Iowa, but to qualify as a "protectable property interest" under the Takings Clause, "a contract must establish rights more substantial in nature than a mere unilateral expectation of continued rights or benefits." *Crippen v. City of Cedar Rapids*, 618 N.W.2d 562, 572 (Iowa 2000).  Hawkeye's expectation that its contracts would not be modified or nullified by the state is undermined by:  (1) its participation in a heavily regulated industry (gambling); (2) the "as may be allowed by law or promulgated regulation" language in the location contracts; (3) the analogous language in the Licensing Terms and Conditions; and, (4) the experience of its owners with South Carolina's video-poker ban.  *See Armstrong v. Collins*, 621 S.E.2d 368 (S.C. Ct. App. 2005).  Hawkeye's contracts are not a cognizable property interest under Iowa law for Takings Clause purposes.

B.

Having identified Hawkeye's property interests (the machines and the TouchPlay business itself), the issue becomes whether Hawkeye suffered a taking

-11-

without just compensation. Two kinds of takings are: (1) per se, involving the "direct government appropriation of or physical invasion of private property"; and (2) regulatory, where a regulation affecting private property "goes too far." *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 537-38 (2005) (quoting *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)).

This case is not a per se taking. Hawkeye did not suffer a "permanent physical invasion." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982). Nor does the statute constitute a total regulatory taking in which Hawkeye has "been called upon to sacrifice *all* economically beneficial uses in the name of the common good." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019 (1992) (emphasis in original). The parties dispute whether *Lucas* applies to non-real property. The district court holds that it does not. *Hawkeye*, 432 F.Supp.2d at 855. *Lucas* involved land, not personal property. And the Court in *Lucas* recognized that landowners have different expectations than owners of personal property about the potential impact of government regulation:

> And in the case of personal property, by virtue of the state's traditionally high degree of control over commercial dealings, he ought to be aware of the possibility that new regulation might even render his property economically worthless (at least if the property's only economically productive use is sale or manufacture for sale).

*Id.* at 1027-28. The Supreme Court since has held that *Lucas* requires compensation "when a regulation deprives on owner of '*all* economically beneficial uses' of his land." *Tahoe-Sierra Pres. Council, Inc., v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 330 (2002). The Court emphasized that *Lucas* "was limited to 'the extraordinary circumstance when *no* productive or economically beneficial use of land is permitted.'" *Id.* And this court has held that *Lucas* does not apply to a claimed property interest in the right to prepay a loan. *See Parkridge Investors Ltd. P'ship v. Farmers Home Admin.*, 13 F.3d 1192, 1199 (8th Cir. 1994). Thus, it appears that *Lucas* protects real property only.

Even if *Lucas* applies to non-real property, Hawkeye still owns 724 working TouchPlay machines. Even without TouchPlay, Hawkeye may take them to another state (or nation) that allows monitor-vending-machine gambling. Hawkeye's President states in an affidavit that the machines "have virtually no market value outside Iowa." But the district court finds that Hawkeye "could sell TouchPlay machines (e.g. salvage value) or reconfigure the TouchPlay machines for a different use." *Hawkeye*, 432 F.Supp.2d at 856.[2] SF 2330 did not deprive Hawkeye of "*all* economically beneficial uses" of its property.

Hawkeye next proposes that SF 2330 is a regulatory taking without just compensation under *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978). *Penn Central* provides "no set formula" to determine when the Fifth Amendment requires compensation. "Whether a particular restriction amounts to a taking depends on the circumstances of each case." *Outdoor Graphics, Inc. v. City of Burlington*, 103 F.3d 690, 694 (8th Cir. 1996). Factors to consider in this "ad hoc, factual inquiry" include: "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct, investment-backed expectations; and (3) the character of the government regulation." *Id.* The first two factors are "primary"; the third "may be relevant in determining whether a taking has occurred." *Lingle*, 544 U.S. at 538-39.

Weighing the *Penn Central* factors, the district court concludes that "the cost of banning TouchPlay machines must not be borne by the public." *Hawkeye*, 432 F.Supp.2d at 858. This court agrees. As to the first prong, SF 2330 had a "devastating economic impact" on its multi-million-dollar TouchPlay investment. But in terms of the second prong, Hawkeye's expectations in its TouchPlay business are discounted by: (1) the heavily regulated nature of gambling in Iowa; (2) the "as may

---

[2] Hawkeye objects in passing to this factual finding. Mr. Armstrong's affidavit, which the district court considered, states that the machines "have virtually no market value outside Iowa," not that the machines have no salvage value, as Hawkeye now contends. The district court's finding is not clearly erroneous. *See* **FED R. CIV. P. 52(a)** ("findings of fact . . . shall not be set aside unless clearly erroneous").

be allowed by law or promulgated regulation" language in the location contracts; (3) the statement in the Licensing Terms and Conditions that, "If a provision in this document conflicts with an applicable statutory or regulatory provision, the statutory or regulatory provisions preempts the conflicting provision in this document"; and, (4) the owners' experience with South Carolina's video-poker ban. No doubt Hawkeye hoped that the Legislature would not stringently regulate or abolish TouchPlay before calendar year 2009 when it would have recouped its investment. However, a "'reasonable investment-backed expectation' must be more than a 'unilateral expectation or an abstract need.'" *Ruckelshaus*, 467 U.S. at 1005.

As to the third prong, the district court is correct that SF 2330 "will only prevent a specific use of TouchPlay Machines," and that usage is "a single stick in the bundle of property rights." *Hawkeye*, 432 F.Supp.2d at 857. SF 2330 may deprive Hawkeye's TouchPlay machines of their most immediately profitable use, but Hawkeye still "has the right to possess, lease and sell" the machines. *Id.* As to Hawkeye's business, Hawkeye can still use its trade routes and goodwill in any legal business other than TouchPlay. Under *Penn Central*, SF 2330 is not a regulatory taking of Hawkeye's property.

IV.

States shall not deprive any person of "life, liberty, or property, without due process of law", or of "the equal protection of the laws." **U.S. CONST. amend. XIV, § 1**. Hawkeye argues that SF 2330 violates both provisions.

A.

"When an equal protection claim is neither based on a 'suspect class' or grounded in a fundamental right, it is subject to a rational basis review." *Gilmore v. County of Douglas*, 406 F.3d 935, 937 (8th Cir. 2005). SF 2330 implicates neither. For social and economic legislation like SF 2330, "the Equal Protection Clause allows the States wide latitude, and the Constitution presumes that even improvident

decisions will eventually be rectified by the democratic process." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). As to SF 2330, therefore, the Constitution requires merely that "there is a plausible public policy reason for the classification, the legislative facts on which the classification is apparently based may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational." *Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992).

First, Hawkeye must show that it is "similarly situated to another group for purposes of the challenged government action." *Carter v. Arkansas*, 392 F.3d 965, 969 (8th Cir. 2004). Hawkeye contends that TouchPlay is similar to all other lottery games, and even to non-lottery amusement devices that dispense tickets redeemable for prizes instead of cash. The district court concludes otherwise. *Hawkeye*, 432 F.Supp.2d at 860. But the district court allows that "even if" TouchPlay is sufficiently similar to other forms of gambling that SF 2330 does not affect, Hawkeye still must negate "'every conceivable basis which might support' the classification." *Id.* (quoting *Gilmore*, 473 F.3d at 939).

Hawkeye claims that "Appellees have been unable to offer" a reason for banning TouchPlay. To the contrary, the Governor imposed a moratorium on new TouchPlay licenses because of concerns about the "proliferation of gambling," and appointed a task force to study ways to protect minors and compulsive gamblers. Regulating gambling is a legitimate public purpose. The Legislature chose to ban TouchPlay entirely. The district court is correct that this "incremental reform of the gaming industry" is not "so attenuated to its asserted purpose that the distinction it draws is wholly arbitrary and irrational." *Id.*; *Nordlinger*, 505 U.S. at 11.

Hawkeye also attacks the district court's speculation that "perhaps" the purpose of SF 2330 "might have been" "in part" TouchPlay's "inadequate safeguards." *Id.* The Equal Protection Clause "does not demand for the purpose of rational-basis review that a legislature or governing decision maker actually articulate at any time the purpose or rationale supporting its classification." *Nordlinger*, 505 U.S. at 15.

Hawkeye cites statistics that most compulsive gambling happens in casinos, and that there are only two confirmed cases of minors using TouchPlay machines. But "a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 315 (1993). The district court properly rejects Hawkeye's equal protection claim.

B.

Hawkeye asserts that SF 2330 also "cannot satisfy rational basis review" under the Due Process Clause. The burden is on Hawkeye "to establish that the legislature has acted in an arbitrary or irrational way." *Koster v. City of Davenport*, 183 F.3d 762, 768 (8th Cir. 1999). As discussed, SF 2330 is neither arbitrary nor irrational, and serves a legitimate public purpose. Hawkeye's due process argument fails.

V.

On April 5, Hawkeye sued for a permanent injunction against SF 2330, before it took effect May 4. Hawkeye asked the district court to "schedule oral argument on the instant Motion for Preliminary Injunctive Relief on the earliest date available . . . ." During an April 6 teleconference, Hawkeye learned that Dr. Edward J. Stanek, the Lottery president since 1985, could not testify at trial on April 12. Hawkeye mentioned the possibility of his testifying by affidavit or video, but at trial presented no testimony from Dr. Stanek. Two weeks later, Hawkeye moved to add his deposition to the record. The next day (April 26), the district court denied Hawkeye's motion, and issued its decision and order. Hawkeye appeals.

The "motion to reopen to submit additional proof is addressed to [the trial judge's] sound discretion." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 331 (1971). This court reviews for abuse of discretion. *Gathright v. St. Louis Teacher's Credit Union*, 97 F.3d 266, 268 (8th Cir. 1996).

Hawkeye requested an expedited trial, knowing one week in advance that Dr. Stanek would be unavailable on the trial date.  His deposition does not contain "testimony on the critical contract interpretation issues then pending before the court," as Hawkeye claims.  He would add no significant information to the record, which already contained his extensive testimony in the form of "Answers to TouchPlay Questions posed by Oversight Committees" of the Legislature.  The district court did not abuse its discretion by denying Hawkeye's motion to re-open.

VI.

The judgment of the district court is affirmed.

_____